ELIZABETH SUSAN (BETTY SUE) STRAKE TRUST, BY J. L. McCONN AND CHARLES A. PERLITZ, JR., AS TRUSTEES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGANNA ALICE STRAKE TRUST, BY J. L. McCONN AND CHARLES A. PERLITZ, JR., AS TRUSTEES, PETITIONER, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

GEORGE WILLIAM STRAKE, JR., TRUST, BY J. L. McCONN AND CHARLES A. PERLITZ, JR., AS TRUSTEES, *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket Nos. 109725, 109726, 109727. Promulgated May 18, 1943.

*Charles A. Perlitz, Jr., Esq.*, for the petitioners.
*S. B. Anderson, Esq.*, for the respondent.

OPINION.

ARNOLD, *Judge:* Each of these proceedings, consolidated for hearing and decision, involves an income tax deficiency for 1939 of $2,-645.05. The question presented is whether $10,655 should be included in the income of each petitioner as a distribution of earnings and profits taxable as a dividend because they purchased stock from a corporation in which they were shareholders for $10,655 less than the fair market value thereof.

The facts were stipulated as follows:

I.

Petitioners are irrevocable trust estates created by three instruments dated September 1, 1935, executed by George William Strake and Susan Elizabeth (nee Kehoe) Strake, husband and wife, as grantors, in favor of the petitioners, who are the daughters and son of grantors. On September 1, 1935, Elizabeth Susan (Betty Sue) Strake was nine (9) years of age, Georganna Alice Strake was three (3) years of age and George William Strake, Jr. was three (3) months of age, and from that date up through 1939 the said children resided in the home of the grantors. Grantors have no present or reversionary interest in the principal or income from the properties of said trusts, except the reversionary interest provided in subparagraph (d) of paragraph VI of the trust instruments (copy attached, Exhibit A), the trust instruments being identical except as to the beneficiary. In December, 1935, the grantors of said trusts made a gift of 300 shares to each of said trusts of the common stock of Strake Petroleum, Inc. E. P. Ross was made trustee of each of said trusts in the original trust instruments, who continued as trustee of said trusts up until June 30, 1942, when he resigned, whereupon J. L. McConn and Chas. A. Perlitz, Jr., were appointed trustees and said J. L. McConn and Chas. A. Perlitz, Jr., are now the duly appointed, qualified and acting trustees of said trust estates and reside in the City of Houston, Harris County, Texas, where said trusts maintain their offices, books and records. All income tax returns, including that for the period involved in these proceedings, have been filed with the Collector for the First District of Texas.

II.

The taxes in controversy are income taxes for the calendar year ended December 31, 1939, and are in the amount of $2,645.05 for each trust, being the entire amount of the deficiency asserted by the Commissioner of Internal Revenue.

III.

Strake Petroleum, Inc., was, during the period involved, a corporation duly incorporated and existing under the laws of the State of Delaware, and was, during such period, engaged in the business of discovering, producing and selling crude oil and other hydrocarbons in their natural state.

IV.

The outstanding capital stock of Strake Petroleum, Inc., before and after the 1939 transaction, shown in paragraph V. below, was owned as follows:

| Stockholder | Prior to Transaction | Dec. 31, 1939 |
|---|---|---|
| George William Strake, Sr | 7,000 | 7,000 |
| Susan Elizabeth (K.) Strake | 500 | 500 |
| Elizabeth Susan (Betty Sue) Strake Trust | 500 | 800 |
| Georganna Alice Strake Trust | 500 | 800 |
| George William Strake, Jr. Trust | 500 | 800 |
| Treasury Stock | 1,000 | 100 |
| Total | 10,000 | 10,000 |

## V.

At a special meeting of the Board of Directors of Strake Petroleum, Inc., held on November 20, 1939, the trustee for each of the petitioners offered to purchase 300 shares of the 1,000 shares of Strake Petroleum, Inc. Treasury Stock. On November 24, 1939, in accordance with the terms of a resolution passed by the Directors at said meeting, Strake Petroleum, Inc., with the knowledge and consent of its Stockholders, made a sale of 300 shares of its stock to each of the petitioners, and received as consideration from each of the petitioners $70,000.00, being $233.33 per share. The petitioners borrowed from the First National Bank in Houston, Texas, $180,000.00 of said amount of $210,000.00. The 900 shares sold to petitioners was purchased by Strake Petroleum, Inc. from Fouts, Amerman, Patterson and Moore in February, 1936 for a consideration of $233.33 per share. None of the other stockholders purchased or acquired any stock or other property of Strake Petroleum, Inc. during the years 1938, 1939, and 1940. The last dividend prior to the said transfer was declared in December, 1938, in an amount of $25.00 per share, which was paid on December 28, 1938. The first dividend declared after the said transfer of stock on November 24, 1939, was declared in December, 1939, in an amount of $30.00 per share, or $24,000.00 to each petitioner and was paid in December, 1939.

## VI.

The fair market value of the capital stock of Strake Petroleum, Inc. was $268.85 per share on November 24, 1939. On January 1, 1939, and as of November 24, 1939, Strake Petroleum, Inc. had an earned surplus and undistributed profits of more than $1,000,000.00, and cash on hand of more than $550,000.00, out of which it could have paid dividends in the amounts of the additional net income as asserted by the Commissioner against the petitioners.

The Commissioner determined that the difference between $70,000, the amount for which Strake Petroleum, Inc. transferred 300 shares of its common treasury stock to each petitioner, and $80,655, the fair market value of the stock at the time, constituted a distribution of earnings or profits to each petitioner taxable as a dividend. He included the difference, $10,655, in the gross income of each petitioner under section 22 (a) of the Internal Revenue Code and section 19.22 (a)–1 of Regulations 103.

Section 22 (a) defines gross income as including gains, profits, and income derived from salaries, wages, dividends, or any source whatever. Section 19.22 (a)–1 of Regulations 103 reads in part as follows:

If property is transferred by a corporation to a shareholder, or by an employer to an employee, for an amount substantially less than its fair market value.

regardless of whether the transfer is in the guise of a sale or exchange, such shareholder or employee shall include in gross income the difference between the amount paid for the property and the amount of its fair market value to the extent that such difference is in the nature of (1) compensation for services rendered or to be rendered or (2) a distribution of earnings or profits taxable as a dividend, as the case may be. In computing the gain or loss from the subsequent sale of such property its basis shall be the amount paid for the property, increased by the amount of such difference included in gross income. * * *

Petitioners attack the above regulation upon the ground that when applied to the present transactions it is violative of the revenue act. They urge that the Commissioner can not by regulation create income when no income in fact exists, *Manhattan General Equipment Co.* v. *Commissioner*, 297 U. S. 129, and point out that in several similar cases the courts and the Board have held like provisions of prior regulations invalid, *Taplin* v. *Commissioner* (C. C. A., 6th Cir.), 41 Fed. (2d) 454, reversing 12 B. T. A. 1264; *Commissioner* v. *Van Vorst* (C. C. A., 9th Cir.), 59 Fed. (2d) 677, affirming 22 B. T. A. 632; *Hawke* v. *Commissioner* (C. C. A., 9th Cir.), 109 Fed. (2d) 946; certiorari denied, 311 U. S. 657, modifying 35 B. T. A. 784; and *J. E. Timberlake*, 46 B. T. A. 1082; affirmed in *Timberlake* v. *Commissioner* (C. C. A., 4th Cir.), 132 Fed. (2d) 259.

We can not agree that the application of the regulation to the present transactions is violative of the revenue act. In *Timberlake* v. *Commissioner*, *supra*, the court accepted article 22 (a)–1 of Regulations 94, as amended, as a correct interpretation of section 22 (a) of the Revenue Act of 1936, and pointed out that its long continuance, together with frequent reenactments of the statute, justified the inference that the regulation had received Congressional approval. Article 22 (a)–1 of Regulations 94, as amended, is, to the extent material, the same as the regulation above quoted, and upon the authority of that case we hold that section 19.22 (a)–1 of Regulations 103 is a correct interpretation of the statute.

Petitioners' reliance upon the *Taplin* and *Van Vorst* cases, *supra*, is not well founded, as demonstrated by more recent decisions. In *Palmer* v. *Commissioner*, 302 U. S. 63, the Supreme Court said:

Section 22 of the Revenue Act of 1928 (26 U. S. C. A. § 22 and note) includes "dividends" in "gross income", which is the basis of determining taxable net income, and section 115 (26 U. S. C. A. § 115 and note) defines "dividend" as "any distribution made by a corporation to its shareholders, whether in money or in other property, out of its earnings or profits." While a sale of corporate assets to stockholders is, in a literal sense, a distribution of its property, such a transaction does not necessarily fall within the statutory definition of a dividend. For a sale to stockholders may not result in any diminution of its net worth and in that case can not result in any distribution of its profits.

On the other hand, such a sale, if for substantially less than the value of the property sold, may be as effective a means of distributing profits among stockholders as the formal declaration of a dividend. The necessary consequence of the corporate action may be in substance the kind of a distribution to

stockholders which it is the purpose of section 115 to tax as present income to stockholders, and such a transaction may appropriately be deemed in effect the declaration of a dividend, taxable to the extent that the value of the distributed property exceeds the stipulated price. But the bare fact that a transaction, on its face a sale, has resulted in a distribution of some of the corporate assets to stockholders, gives rise to no inference that the distribution is a dividend within the meaning of section 115. To transfer it from the one category to the other, it is at least necessary to make some showing that the transaction is in purpose or effect used as an implement for the distribution of corporate earnings to stockholders.

In *Choate* v. *Commissioner*, 129 Fed. (2d) 684, the Second Circuit, after a careful analysis, stated that the basic question involved in the *Palmer* case was whether the corporate action in issuing rights could be regarded as showing an intention to distribute corporate earnings. The Circuit Court stated that in the course of its opinion the Supreme Court discussed divers situations, including one where at the time of sale to the stockholders there was a substantial "spread" between selling price and fair market value favorable to the stockholders. Under such circumstances the Circuit Court said:

> * * * it will be considered that there was a corporate intention to distribute that spread, i. e., that a corporate distribution of earnings, and, therefore, a dividend was intended. The situation is the same as if the company had sold the property to strangers and then distributed to its stockholders an amount of cash equal to the "spread". See *Eastern Carbon Black Co.* v. *Brast* [4th Cir.], 104 Fed. (2d) 460.

In the *Eastern Carbon Black Co.* case, *supra*, the Fourth Circuit specifically stated:

> In the case of ordinary sales, there is no point in distinguishing between market value and sale price, but, where there is a sale to stockholders below market value, this is in effect a distribution among stockholders and the price obtained is not determinative in computing income, a part of which is thus distributed.

In *Timberlake* v. *Commissioner*, *supra*, the Circuit Court said:

> It is of no importance that the transfer assumed the form of a sale and that there was no express declaration of a dividend. The substance of the transaction determines its character for purposes of taxation; and we need only inquire whether the Columbia corporation transferred to the taxpayer and its other stockholders without cost a part of its earnings and profits so that they were severed from and ceased to be a part of the corporate property in which the stockholders had an indirect undivided interest and became their separate and independent holding, of which they could dispose at will.

The court states that its conclusion is clearly indicated by the principles enumerated in *Palmer* v. *Commissioner*, *supra*, wherein the Supreme Court pointed out that a sale of corporate assets, if made for substantially less than the value of the property sold, is as effective as the formal declaration of a dividend to stockholders, if in its purpose or effect, it actually brings about a distribution of corporate earnings among them. Referring to the *Van Vorst* and *Taplin* cases,

*supra*, relied on by the taxpayer in that case, the court said that as they were rendered prior to the decision of the Supreme Court in *Palmer* v. *Commissioner*, *supra*, they must be disregarded in so far as they differ from the rule there announced by the Supreme Court.

In the *Hawke* case, *supra*, a similar regulation was approved as applying to the purchase of stock by an employee from the employer corporation.

While there are factual differences between this case and the authorities cited, it is our opinion that the same principle should govern, regardless of the property transferred by the corporation to its shareholders. The basic inquiry is not whether there was a sale, but whether the corporation transferred to its stockholders without cost a part of its earnings and profits.

The stipulated facts here show that Strake Petroleum, Inc., had an earned surplus and undistributed profits at the time of sale in excess of $1,000,000. The facts show the selling price of the stock to be $70,000 and the fair market value $80,655, or a "spread" of $10,655 on each transaction. These facts, together with the further fact that these transfers were made "with the knowledge and consent of" the stockholders of Strake Petroleum, Inc., and pursuant to a resolution of its board of directors, indicate that in purpose and effect the transactions were an implement for the distribution of a part of corporate earnings to these three stockholders. No other stockholders could possibly object, as they had consented to the transfers. And certainly it can not be denied that to the extent of the difference between selling price and market value there was a diminution of the corporation's net worth.

Petitioners' remaining contention is that, even though the regulation is valid when applied to the present transactions, nevertheless, the purchase price was not substantially less than fair market value within the meaning of the regulation. Whether one amount is "substantially less" than another is a matter to be determined from all the surrounding facts and circumstances. The differential here is $35.52 per share. The effect of the sale was to pass to each petitioner "without cost a part of its earnings and profits so that they were severed from and ceased to be a part of the corporate property in which the stockholders had an indirect undivided interest and became their separate and independent holding of which they could dispose at will," as said by the court in *J. E. Timberlake*, *supra*. We are satisfied by the stipulated facts in this case that petitioners, as stockholders, purchased stock from the corporation for a sum substantially less than the fair market value thereof, and that to the extent of the difference they received in effect a distribution of corporate earnings and profits taxable as a dividend.

*Decision will be entered for the respondent.*