Joseph Scura v. Commissioner. John Scura v. Commissioner.
Scura v. Commissioner
Docket Nos. 56461, 56462.
United States Tax Court
T.C. Memo 1958-161; 1958 Tax Ct. Memo LEXIS 67; 17 T.C.M. (CCH) 801; T.C.M. (RIA) 58161; August 27, 1958
Milton M. Davis, Esq., for the petitioners. Joseph F. Rogers, Esq., and Victor H. Frank, Jr., Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined deficiencies in the income tax of petitioners Joseph Scura and John Scura for the taxable years 1946 and 1947 in the following amounts: Year
Deficiency
Joseph Scura
1946
$1,536.10
Joseph Scura
1947
5,414.89
John Scura
1946
979.17
John Scura
1947
9,303.40 These deficiencies result, first, from respondent's determinations that the alleged bargain purchases by petitioners on two occasions of capital stock of the Amerit Shipping and Trading Corporation, held by it as treasury stock, at $200 per share in 1946 and *68 $1 per share in 1947, which stock was purchased by the corporation prior to the alleged sales for $381.50 per share and $668.50 per share, respectively, constituted taxable dividends; second, from respondent's partial disallowance of contributions of both petitioners in the years 1946 and 1947 to charitable organizations; and third, from respondent's disallowance of medical expenses of petitioner Joseph Scura in 1946 and 1947. By amended answers to amended petitioners filed herein, respondent alleges, as an alternative to his determinations that the alleged bargain purchases constituted taxable dividends, that said purchases constituted compensation to petitioners and were taxable to them as such. The issues for decision in these consolidated cases are: Whether shahres of stock issued to petitioners by a closely held corporation, of which they were shareholders, on two occasions were stock dividends, nontaxable under section 115(f) of the Internal Revenue Code of 1939, or whether the distribution of the shares to petitioners is taxable as ordinary income to the extent of the excess of the fair market value of the shares over consideration paid for them, either because the excess *69 is an ordinary dividend under section 115(a) of the Code and section 29.22(a)-1 of Regulations 111, or because the excess constitutes additional compensation to the petitioners under the same section of the regulations, since they were both shareholders and officers of the corporation; and whether deductions are to be allowed for claimed contributions to charitable organizations and for medical expenses in amounts exceeding those allowed by respondent. Findings of Fact Those facts stipulated and the exhibits attached thereto are made a part of our findings of fact by this reference. Petitioner Joseph Scura is the father of John. During the taxable years both petitioners lived in Brooklyn, New York, and both were shareholders of Amerit Shipping and Trading Corporation, organized on November 2, 1945, under the laws of the State of New York. Joseph Scura filed his income tax return for the year 1946 with the collector of internal revenue for the first district of New York. He filed what purported to be a joint return with his wife, Rose, for the calendar year 1947, although the return was unsigned. John Scura filed his income tax returns for 1946 and 1947 with the collector of *70 internal revenue for the second district of New York. The authorized capital of Amerit Shipping and Trading Corporation (hereinafter referred to as "Amerit"), according to an unsigned copy of the certificate of incorporation appearing in the minute book of the corporation, was 200 shares, all of one class and without par value; this capitalization continued from the inception of the corporation in 1945 until its dissolution in approximately 1951. The bylaws of Amerit provided that "[in] all cases of transfer [of stock], the former certificate must be surrendered up and cancelled before a new certificate be issued." Of the 200 shares authorized, 105 shares were subscribed and issued at the beginning of operations of Amerit in January 1946. The subscription price was $10. The shares in the name of John Scura were paid for by his father and then issued to John in the early part of 1946 when John was discharged from the Army and started to work for Amerit. The shareholders of Amerit and their respective holdings at this time were as follows: No. of shares
Issued to
33
Joseph Scura
33
John Sirignano, Sr.
14
John Scura
5
John Sirignano, Jr.
20
Joseph Buffa
*71 The directors of the corporation, of whom three were authorized by the certificate, were the two Scuras and John Sirignano, Sr. The officers at the time the business commenced were: President
John Sirignano, Sr.
Vice President
Joseph Buffa
Secretary
Joseph Scura
Treasurer
John Scura
Amerit was principally engaged in the business of selling food parcels to persons of Italian extraction or birth in the United States for delivery, in Italy, as gifts to Italian residents from their friends and relatives in the United States. This business lasted from the incorporation of Amerit in November 1945 until October 1949; it was foreseen when the corporation was formed that this business could not be profitably carried on for many years. The ultimate reason for the termination of the gift parcel business of Amerit was a change in the Italian customs laws and regulations governing imports. The components of the gift parcels were: flour, macaroni, coffee, sugar, soap, and rice. These commodities were purchased in the United States in bulk and repackaged for shipment in the New York warehouse of Amerit. The gift parcel business was regulated and licensed by both the United *72 States and Italian Governments. Amerit also maintained a warehouse in Naples, as port of entry for the parcels; there it sored the parcels, and from there it distributed them. In this warehouse the goods were subject to inspection and control of the Italian Government, and when orders were received from residents of the United States for delivery of the gifts, lists were compiled of these orders and copies of these lists were sent to the Italian and United States Governments, which required that such notice be given. Upon submission of these lists to the Italian Government, that government would permit the withdrawal of parcels from the warehouse for delivery. The sales operations within the United States were conducted through several hundred agents who would take the orders and collect the money. Amerit also had one full-time employee in Italy who supervised the distribution of the parcels. The shareholders at the time of the organization and inception of business, and at all times subsequent thereto, were active in the managment and operations of the corporation so long as they continued as shareholders, except for a brief period at the beginning of operations when John Scura *73 was still in the Armed Forces, and except as to Sirignano, Jr., about whose activities there was no evidence. The financial condition of Amerit for the years from 1945 to and including 1951 is reflected in the following information included in the corporation income tax return for Amerit for those years: 1945
1946
1947
1948
Gross Sales Less Returns
$15,089.00
$826,222.30
$1,235,642.13
$1,343,594.25
Less Cost of Goods Sold
4,197.50
300,127.95
1,000,394.14
1,138,824.47
Gross Profit from Sales
$10,891.50
$526,094.35
$ 235,247.99
$ 204,769.78
Other Gross Receipts,
14,909.68
14,824.85
etc.
Interest
5.43
12.63
15.00
Purchase Discount
426.51
1,855.98
2,665.13
Commissions
46.59
1,879.39
9,450.92
5,951.78
Total Income
$25,847.77
$528,405.68
$ 261,392.37
$ 213,401.69
Total Deductions
23,204.04
444,411.53
160,820.67
156,736.91
Net Income or Loss
$ 2,643.73
$ 83,994.15
$ 100,571.70
$ 56,664.78
Total Income Tax
$ 660.92
$ 31,917.78
$ 38,217.25
$ 21,532.61
1949
1950
1951
Gross Sales Less Returns
$371,046.82
$ 66,028.55
$ 50,918.96
Less Cost of Goods Sold
352,925.03
78,448.30
48,346.16
Gross Profit from Sales
$ 18,121.79
($ 12,419.75)
$ 2,572.80
Other Gross Receipts,
3,536.79
etc.
Interest
789.75
12.68
Purchase Discount
222.89
1.95
538.88
Commissions
35,237.59
16,360.44
1,442.68
Total Income
$ 54,372.02
$ 7,492.11
$ 4,554.36
Total Deductions
104,578.91
40,466.99
13,805.35
Net Income or Loss
($ 50,206.89)
($ 32,974.88)
($ 9,250.99)
Total Income Tax
*74 The president of Amerit, John Sirignano, Sr., was in Italy during a large part of the year 1946 to supervise the business of the corporation there, which involved distribution of the parcels and obtaining the licenses and permits necessary for the importation to and delivery in Italy of the parcels. He specifically was engaged in preventing and stopping violations of Italian import regulations and possible black-market operations. Difficulties developed between Sirignano, Sr., and John Scura during this period. Sometime late in August or early September of 1946 John Sirignano, Sr., returned to the United States, filled with unpleasant sentiments toward John Scura, which the latter fully reciprocated. Sirignano remained a shareholder and an active officer of Amerit for about 10 days after his return. It became apparent that he and John Scura could not work together in the corporation. Following 2 days of discussion and negotiation between himself and the other officers, conducted with passion and emotion by all the parties, Sirignano sold his 33 shares of stock in Amerit and his son's 5 shares, as well, for a total consideration of $14,500.80. The date of this sale was September 10, 1946. The *75 price paid for the Sirignanos' stock, per share, was approximately $381.58. Though Sirignano, Sr., signed the contract of sale prepared by an attorney, which reads as follows: "I, John Sirignano, for myself and my son, John Sirignano, Jr., for the consideration of the sum of FOURTEEN THOUSAND FIVE HUNDRED AND no/100 dollars ($14,500.00) hereby agree to sell my thirty-three (33) shares of stock and my son's five (5) shares of stock in the AMERIT SHIPPING AND TRADING CORP. to JOSEPH SCURA, JOHN SCURA and JOSEPH BUFFA or to their assigns. I represent to them that John Sirignano, Jr., my son, will execute the assignment of his five (5) shares of stock in the course of the next few days [,]" the sale was treated as one to the corporation itself. The corporation paid Sirignano and his son for the shares, and the corporation debited the amount of the value paid for the stock to "Treasury Stock." The journal of Amerit for October 31, 1946, contains the following entry, reflecting a sale by Amerit of the stock formerly held by the Sirignanos, then being held as treasury stock: Loans Receivable
$7,600
Treasury Stock
$7,600 Sales of following shares of capital *76 stock at $200 each Shares
John Scura
15
$3,000
Joseph Scura
9
1,800
Joseph Buffa
9
1,800
Ilia Chapulari
5
1,000
On December 31, 1946, the following entry appeared: Surplus
$6,900
Treasury Stock
$6,900
To close out Treasury Stock Account. Difference due to price under that for which stock was bought. Chapulari was an employee of Amerit. The bargaining which preceded the sale of the Sirignanos' stock to the corporation was conducted in an atmosphere of personal enmity. The seller originally asked between $25,000 and $30,000 for the 38 shares, but finally accepted about one-half that amount. Sirignano wanted to receive what his and his son's interest in Amerit was worth, but was unsure himself when the negotiations for the sale started exactly what was the value of this interest. The shares of this closely held corporation had not been and were never sold on the open market. The profit and loss statement of Amerit for the period from January 1 to August 31, 1946, shows the book value of the Amerit shares as of the latter date to be $298.10. This statement was prepared shortly after the shares were purchased from the Sirignanos, *77 in late September. The statement as prepared by Amerit's accountant reads: Gross Sales
$517,718.10
Less Cost of Goods Sold: Inventory on January 1, 1946
$ 100.00
Plus Mercandise Bought for Sale
213,771.68
$213,871.68
Less Inventory as of August 31, 1946
46,188.85
167,682.83
Gross Profit
$350,035.27
Less Expenses
274,053.39
$ 75,981.88
Less Depreciation: 10% of $1,436.86 Furniture &
143.86
Fixtures
$ 75,838.02
Less Reserve for Taxes: Federal - Normal Tax, 24% of $75,838.02
$ 18,201.12
Federal - Surtax, 14% of $75,838.02
10,617.32
State - Franchise Tax, 4.50% of $75,838.02
3,412.71
32,231.15
$ 43,606.87
Less Reserve for Contingencies
16,000.00
$ 27,606.87
Capital Stock
$ 1,050.00
Surplus as of December 31, 1945
2,643.73
Surplus as of August 31, 1946
27,606.87
Total Capital Stock - Surplus
$ 31,300.60
Book Value of Each Share ($31,300.60 / 105)
298.10
The acquisition of the 38 shares, purchased from the Sirignanos and held as treasury stock, by the remaining shareholders of Amerit and by Chapulari was arranged about a month after the sale by the Sirignanos. In connection with this acquisition *78 the corporation's accountant informed the Scuras that for such an acquisition of shares held in treasury to be legal it must be for consideration in the amount of fair market value. The accountant then made computations of what he considered was fair market value, based upon the profit and loss statement set out above, and on the following factors as well: The corporation was young, its assets were mostly abroad, its inventory was of a nature that rapid deterioration was possible and risk of loss great, that world conditions made overseas operations hazardous, and that because of the nature of the business the period of its successful operation was liable to be short. His opinion as expressed to the Scuras was that the fair market value of the shares in the fall of 1946, prior to October 31 when the journal entry recording the payment by the recipients for the shares was made, $200was per share, despite the fact that the profit and loss statement, prepared in late September of 1946 and presumably at the time the accountant was formulating this opinion, showed the book value of Amerit shares to have been $298.10 per share at the end of August even after the deduction of a reserve for *79 contingencies in the amount of $16,000. Pursuant to the advice of the accountant the Scuras, Buffa, and Chapulari paid to Amerit $200 a share for the treasury stock which they acquired. The fair market value of this stock was $300 per share when it was acquired by petitioners in 1946. The shareholders of Amerit and their interests therein, following the sale of the treasury stock acquired from the Sirignanos, were: No. Shares
"Treasury"
Previously
Shares
Shareholder
Held
Purchased
Total
Joseph Scura
33
9
42
John Scura
14
15
29
Joseph Buffa
20
9
29
Ilia Chapulari
None
5
5
The officers of Amerit at this time were: President
John Scura
Vice President
Joseph Buffa
Treasurer
Joseph Scura
Ilia Chapulari received the 5 shares which Sirignano, Jr., had held, and the journal of Amerit for October 31, 1946, showed that $1,000 was paid for them. The journal entry showed only that consideration for the quantity of stock received was paid, and the amount paid stands opposite the name of the recipient of the shares. No corporate records showed the time or the manner in which the shares were actually paid for and there *80 was no financial record of payment by one shareholder in behalf of another. Joseph Scura characterized the transaction as a pro rata distribution and explained the disproportionate number of shares acquired by John Scura (to the extent that it was disproportionate) as a "gift" which his son received, to which he, Joseph, would have been entitled, but he did not file a gift tax return reporting it as such; he made no statement in writing disclosing an intent to make a gift or evidencing delivery of a gift; he did not make a transfer of the stock certificates by his signature; and he did not proceed in accordance with the requirement in the bylaws of the corporation for the transfer of stock, that is, that the "former certificate must be surrendered up and cancelled before a new certificate be issued." There was, however, an informal plan within the Scura family group that John should be permitted to acquire such a number of the shares held as treasury stock that he would hold, after the issuance of the shares formerly owned by the Sirignanos, the same amount of stock as Buffa, the larger shareholder outside the family group. The issuance of the 38 shares of the departing shareholders *81 held in treasury for $200 per share in 1946 took place at a time when the earnings and profits of the corporation were more than sufficient to pay dividends in cash in the amount of the difference between the consideration of $200 per share and the value paid the departing shareholders, $381.58 per share, i.e., a difference of $181.58 per share, or a total of approximately $6,900. In 1947 Buffa wished to leave the corporation, and on July 9, 1947, at a meeting of the board of directors of Amerit, the following resolution was adopted by an affirmative vote of the three directors, the two Scuras and Buffa: "WHEREAS JOSEPH BUFFA is the owner and holder of 29 shares of stock of this corporation and is offering for sale all of his said stock at $668.50 per share; and there being surplus capital in the treasury to purchase all such shares of stock, now therefore, be it "RESOLVED, that the officers of this corporation be and they hereby are authorized and empowered to purchase from said JOSEPH BUFFA his shares of stock for $19,386.50 in behalf of the corporation to be held as treasury stock. Payment to be made therefrom from the surplus money in the treasury." The computation of the *82 figure $668.50 was made by the accountant employed by the corporation on the basis of the liquidating or book value of the stock according to the profit and loss statement of the corporation as of May 31, 1947. The original computation of this book value arrived at the figure $550.40, but in a subsequent addendum to that statement an item of profit on the liquidation of the credit balance of an Amerit representative in Naples increased the book value figure to $668.50. On July 18, 1947, the shareholders of Amerit resolved and consented to a sale of the Buffa stock, then held in treasury, to themselves. The minute book of the corporation for that date contains an entry which reads: "At a special meeting on due notice to all of the stockholders duly held on the 18 day of July, 1947. "Upon motion duly made and seconded, the following resolution was adopted by the affirmative vote of stockholders representing 76 shares, being a majority of the shares entitled to vote thereon, "RESOLVED that the consideration for which the shares of treasury stock which this corporation now owns may be sold to stockholders or their designees is fixed at One ($1.00) Dollar per share upon filing with *83 this corporation the unanimous consent in writing by all of the stockholders entitled to vote. "WE, the undersigned, stockholders of the corporation, each owning the number of shares set opposite each signature hereto, and owning, collectively, all of the shares thereof issued and outstanding entitled to vote thereon, there being an additional 29 shares held as treasury stock; "CONSENT, that said corporation sell all of its shares of treasury stock heretofore duly authorized on the 7th day of October, 1947, to the holders of the outstanding stock or their designees for One ($1.00) Dollar per share, such sum being less than the par value or true value of said shares of stock as follows: "To JOHN SCURA
shares of stock
21
To JOSEPH SCURA
shares of stock
8
To JOHN DOE
shares of stock
None
Number
"Signatures
of shares
(Signed) JOSEPH SCURA
42
(Signed) JOHN SCURA
29
(Signed) ILIA CHAPULARI
5"
The fair market value of the shares as of this time was $668.50 per share. The amount of consideration for the issuance of these 29 shares was fixed by an attorney engaged by the corporation at the time. Ilia Chapulari soon ceased being a shareholder *84 in Amerit, selling his 5 shares of stock to the corporation for $3,000 on or about December 31, 1947. Following the issuance of the Buffa shares, each of the Scuras, John and Joseph, owned 50 shares in Amerit. This equality of holdings, this time between the Scuras themselves, was the result once again of an informal plan within the family group whereby John was permitted to acquire a number of shares of treasury stock disproportionate to his prior holding. And on the last day of 1947 the corporation declared a stock dividend of one-on-one to the existing shareholders, which as of that day did not include Chapulari, whose shares were purchased out of surplus by the corporation for $3,000. The minute book of Amerit recorded the stock dividend as follows: "At a special Meeting of the Board of Directors held on the 31st day of December 1947 whereat the following Directors were present: "John Scura Joseph Scura "WHEREAS, the accountant for the corporation, Leonard Fragomini, has reported that the corporation has a surplus in the sum of $87,156.21 as of this date. "WHEREAS, in view of said surplus, the Board of Directors is desirous of declaring a dividend payable in the *85 capital stock of the corporation to the extent of 100% upon motion duly made and seconded, the following resolution was adopted by the affirmative vote of both Directors: "RESOLVED, that a stock divident of 100% be payable to all the outstanding shares of stock of this corporation to the record holders in the books of the corporation, as of December 31st, 1947, and it is further "RESOLVED, that the Secretary of this corporation, together with the signatory officers be, and they hereby are, authorized to issue shares of stock hereby declared as stock dividend to the record holders as hereinabove set forth, on or before the 31st day of March, 1948." The holdings of each of the Scuras in Amerit after December 31, 1947, were 100 shares; there were no other shareholders. At all times during the period when the Buffa shares were purchased, held in treasury, and reissued, the corporation had earnings and profits sufficient to cover a cash dividend in the amount of $19,357.50, the total difference between the amount of the purchase price of the shares from Buffa by the corporation and the $29 consideration which an attorney had advised be paid by the shareholders for the 29 shares. *86 The petitioner Joseph Scura claimed deductions based upon medical expenses in the years 1946 and 1947 in the respective amounts of $3,380 and $3,528. No written evidence of these expenses was introduced and no testimony corroborating the testimony of this petitioner was introduced. The petitioner, however, testified as to the necessity of certain expenditures to various doctors and nurses in each year, and submitted names of certain doctors and nurses who treated and cared for him and his wife during those years. Included in his medical expenses claimed for the year 1946 was an item of $2,500 for expenditures made while "recuperating" at a resort hotel. The respondent disallowed all of the deductions on account of medical expenses for lack of substantiation. Petitioner Joseph Scura had medical expenses during the year 1946 in the sum of $600 and had medical expenses during the year 1947 in the sum of $3,000. Both petitioners claimed charitable contribution deductions in both years in issue, 1946 and 1947. No written evidence was adduced, nor any testimony corroborating the testimony of petitioners. The amounts of the deductions claimed on account of contributions by Joseph for *87 the years 1946 and 1947 were $1,250 and $2,835, respectively. Respondent allowed these deductions in the amount of $750 for each year. The amounts of the deductions claimed on account of contributions by John for the 2 taxable years were $1,050 and $2,820, respectively. Respondent allowed these deductions in the amount of $550 for 1946 and $750 for 1947. The deductible contributions made by each of the petitioners were in amounts not in excess of those allowed by respondent. Opinion KERN, Judge: Upon the issue having to do with the part of the deficiencies resulting from respondent's determination that petitioners realized income by reason of their acquisitions of Amerit's stock in 1946 and in July of 1947 at bargain prices, it is petitioners' first contention that their acquisitions of this stock were the result of what was in effect and equivalent taxwise to a distribution of a stock dividend. With this contention we disagree. Contrary to the procedure followed in December 1947, when Joseph and John were the sole owners of Amerit's stock and a true stock dividend was declared and paid proportionately to them, the transactions of 1946 and July 1947 were in the form of sales *88 resulting in the acquisition by all of the stockholders (plus a nonstockholder in 1946 and minus one stockholder in July 1947) of a number of shares of treasury stock which was disproportionate to their prior holdings, and for which each of them paid consideration. In an attempt to show that their acquisitions of stock here in question were in effect pro rata to their original holdings of stock, petitioners point to the fact that after these acquisitions their proportionate stock ownership as a family group remained approximately the same, and any apparent disproportion between the number of shares acquired and their prior holdings was the result of a gift of some kind made by Joseph to John. We are not aware of any authority (statutory or otherwise) which would justify us in concluding that the "proportionate" requirement incident to a nontaxable stock dividend is satisfied if the proportion exists not as to individual stockholders but as between groups of stockholders classified by family. So far as the alleged "gift" is concerned, the record before us indicates that the only gifts which could have been made were gifts, directly or indirectly (i.e., payments made by Joseph to *89 Amerit on John's behalf), from Joseph to John of funds with which to purchase Amerit's stock. Such gifts may have been made in recognition of the disproportionate stock ownership as between them and as steps in lessening this disproportion, but such gifts of funds in and of themselves cannot create a proportion. As we view the facts of the instant case the petitioners twice purchased shares of treasury stock of Amerit in transactions in which the number of shares purchased was not in proportion (not in "approximate" proportion) to the number of shares owned prior to such sales by the purchasers. We therefore conclude that the acquisitions of such shares by petitioners were not nontaxable stock dividends but were taxable to petitioners as dividends under the reasoning of Elizabeth Susan Strake Trust, 1 T.C. 1131, and Stanley V. Waldheim, 25 T.C. 839, affd. (C.A. 7, 1957) 244 Fed. (2d) 1, to the extent that their fair market value exceeded the amount paid therefor. See Regulations 111, section 29.22(a)-1, as amended by T.D. 5507, 1946-1 C.B. 18. The question then arises as to whether and to what extent the fair market value of *90 the stock acquired by petitioners was in excess of the price paid by them as of the dates of the several purchases. Petitioners contend that the fair market value of the shares did not exceed $200 per share at the time of the 1946 purchase and did not exceed $250 per share at the time of the 1947 purchase. The following matters of record are pertinent to a consideration of this valuation question: (1) The three isolated sales of this stock made by the Sirignanos, by Chapulari, and by Buffa; (2) the opinion testimony of a public accountant employed by Amerit (as to the 1946 value); (3) the opinion testimony of petitioners (to the effect that it had no fair market value); (4) the book value as disclosed by various balance sheets (see B. F. Edwards, 39 B.T.A. 735 [Dec. 10,658]); and (5) the earning record and prospects of the company. The respondent in his notice of deficiency determined that the fair market values were in amounts equivalent to the prices paid by Amerit to the Sirignanos and Buffa for its stock immediately prior to the acquisition of the stock by petitioners. In the case of the Buffa stock, the price paid by Amerit for this stock in 1947 was equivalent *91 to its then book value. The facts of record are not inconsistent with this figure. The only opinion testimony on the value of the stock as of this time is that of petitioners to the effect that it had no value. This opinion testimony is in our opinion obviously erroneous. We therefore conclude that petitioners have failed to prove that respondent erred in his determination as to the value of the stock as of the time it was acquired by petitioners immediately after its sale to the corporation by Buffa. In the case of the Sirignano stock, the situation is somewhat different. This stock was purchased from the Sirignanos under circumstances indicating that it was not a normal business transaction but was a financial solution to a vendetta, consummated in hot blood. The price finally paid for the stock was considerably in excess of its book value. After a consideration of the entire record and all pertinent factors, we have concluded that the fair market value of the stock when it was purchased by petitioners in 1946 was $300 per share. The remaining questions are whether respondent erred in disallowing in full the deductions claimed by Joseph on account of medical expenses and in disallowing *92 in part the deductions claimed by both petitioners on account of contributions. These questions are purely factual and have been resolved by us in our findings of fact. The principal item involved in the medical expenses of Joseph, claimed as deductions for 1946, was the amount of $2,500 identified as his expenses for a month and a half at a resort hotel at Saratoga Springs. According to his testimony he thought that he went there in 1946. He further testified that he went there for recuperation. There is no testimony as to the nature of Joseph's illness that required him to recuperate at a resort hotel and no testimony that he went there at the direction of any doctor. The record does not furnish proof that respondent erred in disallowing this item as a deduction. With regard to the other medical expenses, we have made our findings under the principles enunciated in Cohan v. Commissioner, 39 Fed. (2d) 540. With regard to the deductions claimed on account of contributions, we note that the respondent has allowed substantial parts of these claimed deductions. As to the balance which was disallowed, it is our opinion that the evidence here before us fails to prove that *93 respondent erred in refusing to allow these deductions in greater amounts. Decisions will be entered under Rule 50.