# 1178

LESTER E. DELLINGER AND ANNE R. DELLINGER, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT.

Docket No. 72838. Filed September 14, 1959.

*J. Alex Neely, Jr., Esq.*, for the petitioners.
*James E. Johnson, Jr., Esq.*, for the respondent.

FISHER, *Judge:* Respondent determined a deficiency in income tax against petitioners for the taxable year 1954 in the amount of $1,344.35.

The principal issues presented for our decision herein are (1) whether petitioner, in the taxable year 1954, acquired three lots from Lake Forest, Inc., a corporation in which he was a stockholder, at bargain prices so as to render the excess of the fair market value over the price paid taxable to him as a dividend under section 301, Code of 1954; and (2) if so, whether, and to what extent, if any, earnings and profits available for distribution as dividends by the corporation for the taxable year in which the distribution was made were less than the distributions to petitioner.

### FINDINGS OF FACT.

Some of the facts are stipulated, and, as stipulated, are incorporated herein by reference.

Lester E. and Anne R. Dellinger were husband and wife and residents of Greenville, South Carolina, during the taxable year 1954. They filed a joint income tax return for the taxable year 1954 with the director of internal revenue for the district of South Carolina.

Lester E. Dillinger (hereinafter referred to as petitioner) has been a practicing dentist since 1948. With the exception of 2 years in the United States Army, petitioner has had no other occupation.

Lake Forest, Inc., a corporation formed to subdivide land and sell lots, was incorporated under the laws of South Carolina on March 17, 1953, and commenced business on April 15, 1953. Petitioner became one of the original stockholders of Lake Forest, Inc., and has at all times owned a one-third stock interest therein. Since Lake Forest, Inc., was organized, the following persons have held stock in the corporation as indicated below:

| Name | Number of shares | Cost |
|------|------------------|------|
| S. W. Creech | 46 | $4,600 |
| L. E. Dellinger | 46 | 4,600 |
| J. S. Taylor, Jr | 23 | 2,300 |
| J. S. Taylor, Sr | 23 | 2,300 |
| Total | 138 | 13,800 |

Petitioner's total cash investment in Lake Forest, Inc., was $3,500. He was also liable for indebtedness on the land development project in the amount of $10,000. Petitioner invested said amount upon the suggestion of John S. Taylor, Jr., a real estate dealer in Greenville, South Carolina, whose experience and ability in the real estate business were deemed sufficient consideration for part of his stock ownership in the corporation.

Prior to becoming a stockholder in the corporation, petitioner had had no experience in dealing with real estate. Petitioner has never had any personal experience in the evaluation of land nor has he ever been asked to appraise the value of a piece of land.

Lake Forest, Inc., acquired undeveloped land and subdivided it into approximately 129 lots. The total cost of these lots to the corporation, including improvements, made the basis of each lot $615.29 in the hands of Lake Forest, Inc. The amount paid the mortgagee for releases from the mortgage lien was $250 per lot.

The subdivision developed by Lake Forest, Inc., is located in the northeastern part of Greenville, South Carolina, which is considered one of the better residential sections of the city.

The corporation developed the subdivision in three sections. As each section proved successful, another section was developed and opened. Sales of the corporation were handled by John S. Taylor and Company. The sale prices of the lots were determined by the board of directors and based on the valuations of John S. Taylor, Jr. The real estate venture has proved successful. Of the original 129 lots in the subdivision, only 7 or 8 lots remained to be sold at the time of the instant proceeding.

Since its organization, the corporation has, from time to time, sold lots in the subdivision to each of the stockholders at prices not exceeding the cost of the lots to the corporation. Each time a lot was sold by the corporation for cost or less to one of the stockholders, the remaining stockholders, pursuant to a "general plan or purpose," were allowed to purchase a lot for the same price. None of the stockholders acquired lots from the corporation without the remaining stockholders acquiring lots at approximately the same time.

During the calendar year 1954, three lots were sold to petitioner by Lake Forest, Inc., as follows:

| Lot description | Date of sale | Price paid |
| --- | --- | --- |
| 65 Tranquil Ave | Jan. 17, 1954 | $615.29 |
| 155 Rockmont Rd | Sept. 20, 1954 | 615.00 |
| 100 Berryhill Rd | Sept. 18, 1954 | 250.00 |

Lot No. 65 Tranquil Avenue was acquired by petitioner for the purpose of erecting a personal residence, and petitioner thereafter built a house on it.

Lot No. 155 Rockmont Road was a lakefront lot located in the third and last section of the subdivision to be developed. There were seven lakefront lots on Rockmont Road, of which three were sold to the stockholders of the corporation. At the time petitioner acquired lot No. 155 Rockmont Road, water pipes had been installed. Paving was completed about 2 months later. At the time said lot was acquired by petitioner, lots in that subsection were listed for sale to customers at prices ranging from $4,000 to $5,000. None of the lakefront lots have been sold to individuals other than the stockholders. No improvements have been made by petitioner on the Rockmont Road lot and he had the lot listed for sale at the time of the instant trial.

Lot No. 100 Berryhill Road was acquired by petitioner for $250 from the corporation for investment purposes. In April 1955, 7 months later, he sold the Berryhill Road lot for the sum of $2,445.

The lowest price which the corporation accepted for any lot in the Lake Forest subdivision, other than from a stockholder, was $1,800.

In addition to the three lots sold to petitioner in the taxable year 1954, lots were also sold to the other stockholders as follows:

S. W. CREECH

| Lot description | Date of Sale |
| --- | --- |
| 41 Tranquil | Jan. 7, 1954 |
| 156 Rockmont | Sept. 20, 1954 |
| 104 Berryhill | Oct. 7, 1954 |

J. S. TAYLOR, JR. AND SR.

| Lot description | Date of Sale |
| --- | --- |
| 11 Fairfield | Sept. 3, 1953 |
| 161 Hermitage | Sept. 20, 1954 |
| 110 Hermitage | Oct. 12, 1954 |
| 102 Berryhill | Feb. 10, 1955 |
| ½ of 12 Fairfield | Sept. 29, 1955 |

Lake Forest, Inc., reported the following sales for the fiscal year ended March 31, 1955:

| | |
|---|---:|
| 26 regular sales | $62, 875. 75 |
| 25 installment sales | 60, 280. 50 |

The corporation realized taxable income of $4,793.77 for the fiscal year ending March 31, 1954, and taxable income in the amount of $22,863.82 for the fiscal year ending March 31, 1955.

Lake Forest, Inc., has never declared a formal dividend to its stockholders.

OPINION.

*I.*

Respondent determined that petitioner purchased three vacant lots from Lake Forest, Inc., a corporation in which he held a one-third stock interest, at prices less than their fair market value, so as to render the excess of the fair market value over the price paid, taxable to petitioner as a dividend for the taxable year 1954 in the aggregate amount of $6,664.71. It is respondent's position that petitioner's "bargain purchase" of said lots was essentially equivalent to the distribution of a dividend under section 301 of the Code of 1954.[1] For reasons hereinafter stated, we agree.

At the outset, we note that the basic inquiry is not whether there was in fact a sale, but whether the corporation transferred to its stockholders, including petitioner, without cost, a part of its earnings and profits. Although, as a general rule, income does not arise from the purchase of property for less than its fair market value, a bargain sale to a stockholder by a corporation may result in a dividend to the stockholder to the extent that the fair market value of the property

---

[1] SEC. 301. DISTRIBUTIONS OF PROPERTY.

(a) IN GENERAL.—Except as otherwise provided in this chapter, a distribution of property (as defined in section 317(a)) made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

(b) AMOUNT DISTRIBUTED.—

(1) GENERAL RULE.—For purposes of this section, the amount of any distribution shall be—

(A) NONCORPORATE DISTRIBUTEES.—If the shareholder is not a corporation, the amount of money received, plus the fair market value of the other property received.

\* \* \* \* \* \* \*

(2) REDUCTION FOR LIABILITIES.—The amount of any distribution determined under paragraph (1) shall be reduced (but not below zero) by—

(A) the amount of any liability of the corporation assumed by the shareholder in connection with the distribution, and

(B) the amount of any liability to which the property received by the shareholder is subject immediately before, and immediately after, the distribution.

(3) DETERMINATION OF FAIR MARKET VALUE.—For purposes of this section, fair market value shall be determined as of the date of the distribution.

\* \* \* \* \* \* \*

(d) BASIS.—The basis of property received in a distribution to which subsection (a) applies shall be—

(1) NONCORPORATE DISTRIBUTEES.—If the shareholder is not a corporation, the fair market value of such property.

transferred exceeds the consideration paid therefor. Whether the transfer or sale of property to the stockholder constitutes a dividend to him for income tax purposes is not controlled by the intent of the parties to the transaction but depends upon the circumstances and actual effect of the particular transaction. It is immaterial that the transfer assumes the form of a sale or that there is no express or formal declaration of a dividend, especially where it is evident that the sale does not constitute an arm's-length transaction. *Palmer* v. *Commissioner*, 302 U.S. 63 (1937); *Stanley V. Waldheim*, 25 T.C. 839 (1956), affd. 244 F. 2d 1 (C.A. 7, 1957).

Section 316 of the Code of 1954 defines dividends as "any distribution of property made by a corporation to its stockholders—(1) out of its earnings and profits." As a corollary, section 317 defines property as "money, securities, and any other property."

Section 1.301-1(j), Income Tax Regs., provides, in part, that:

If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * *

Substantially the same language employed in this regulation has appeared in prior regulations relating to corporate distributions, and has repeatedly received court approval. *Elizabeth Susan Strake Trust*, 1 T.C. 1131 (1943), and cases cited therein.

In *Timberlake* v. *Commissioner*, 132 F. 2d 259 (C.A. 4, 1942), affirming 46 B.T.A. 1082 (1942), the Court of Appeals for the Fourth Circuit considered the question of bargain purchases by shareholders similar to the ones involved herein. There, four persons owned all of the stock of a wholesale grocery corporation in South Carolina. The corporation sold certain property to them, substantially in proportion to their stockholdings, at a price which was less than the fair market value. Holding that the excess of value over the purchase price was taxable income to the stockholders under the applicable statutes and regulations, the court said (p. 261):

The substance of the transaction determines its character for purposes of taxation; and we need only inquire whether the Columbia corporation transferred to the taxpayer and its other stockholders without cost a part of its earnings and profits so that they were severed from and ceased to be a part of the corporate property in which the stockholders had an indirect undivided interest and became their separate and independent holding, of which they could dispose at will. Certainly this was the effect of the sale, for the increment of value represented by the difference between the purchase price of the stock paid by the corporation in 1928 and its value in 1936, when it was sold at cost to the stockholders, was transferred by the corporation to them as effectually as if a one-third interest in each share of the Charleston stock had been distributed to the

Columbia shareholders in the form of dividends. The existence of a surplus from which such a dividend could lawfully be paid was clearly shown.

To the same effect, see *Eastern Carbon Black Co.* v. *Brast*, 104 F. 2d 460 (C.A. 4, 1939), and *V. U. Young*, 5 T.C. 1251 (1945), supplemental opinion 6 T.C. 357 (1946).

The record shows that Lake Forest, Inc., although successful from its inception, has never formally declared a dividend. The stockholders, however, from time to time, as part of the "general purpose," withdrew inventory assets, that is, vacant lots, from the corporation at discount prices under an arrangement whereby each was allowed to acquire lots on substantially a pro rata basis. During the taxable year 1954, petitioner purchased three lots from the corporation for the respective amounts of $615.29, $615, and $250. (Although petitioner alleges that the latter amount is $360 under the price he actually paid for the lot, he does not contest respondent's determination in this respect.) While petitioner contends that said consideration reflected the fair market value of the three lots at the time of acquisition, the facts show that the Berryhill lot, acquired in September 1954 for $250, was sold by him 7 months later for $2,445. Another of the lots which he acquired for $615 was a lakefront lot located in the third and most expensive section of the overall realty development. These lots were listed to customers from $4,000 to $5,000 each. Petitioner built his personal residence on the third lot at 65 Tranquil Avenue. None of the lots in the subdivision (which consisted of about 129 lots) have been sold for less than $1,800 to persons other than stockholders.

We find no merit in petitioner's argument that the purchase of the lots at cost or less from the corporation did not constitute a dividend distribution merely because petitioner and Creech (one of the shareholders) only purchased three lots each, whereas Taylor purchased five lots. The law is well settled that a distribution of corporate earnings to shareholders may constitute a dividend, notwithstanding that it is not in proportion to stockholdings. *Paramount-Richards Th.* v. *Commissioner*, 153 F. 2d 602, 604 (C.A. 5, 1946), affirming a Memorandum Opinion of this Court.

Petitioner, who has the burden of proof, has not adduced any explanation for the disproportionate sale of the lots to the stockholders. Moreover, as there is no evidence that petitioner or Creech complained of this seeming inequality, under the circumstances they must be deemed to have ratified the distribution. *Lincoln Nat. Bank* v. *Burnet*, 63 F. 2d 131 (C.A.D.C., 1933), affirming 23 B.T.A. 1304 (1931).

Applying the principles mentioned hereinabove to the facts of record, we are convinced that petitioner, as a stockholder, purchased

the lots in question from his corporation for a sum substantially less than the fair market value thereof, and that, to the extent of the difference, he received, in effect, a distribution of corporate earnings and profits taxable as a dividend. Unquestionably, the situation is the same as if the corporation had sold the inventory assets to strangers at fair market value and then distributed to its stockholders an amount of cash equal to the net profit realized from the transaction.

Petitioners, on brief, cite *Commissioner* v. *Van Vorst*, 59 F. 2d 677 (C.A. 9, 1932), in support of the view that the purchases in question did not constitute dividend distributions. Suffice it to say that this decision was filed prior to the opinion of the Supreme Court in *Palmer* v. *Commissioner*, *supra*, and, insofar as it differs from the rule announced therein, must, of course, be disregarded.

Petitioners, on brief, likewise endeavor to distinguish *Waldheim* and *Timberlake*, both *supra*, from the instant proceeding on the ground that in said cases the facts show that there was no business purpose underlying the distribution of corporate assets and that the property distributed had a "readily realizable market value," and, hence, that the court properly found that the objective was to distribute corporate earnings. Petitioners contend here that they purchased two of the lots for a distinct business purpose; that is, to aid in the development of the new subdivision. The record does not satisfy us, however, that there was any business purpose of substance underlying the sales in question, and we think it clear that the lots sold to petitioner were readily salable to the public at large.

We turn to the question as to whether and to what extent the fair market value of the lots acquired by petitioner was in excess of the price paid by him as of the dates of the several purchases. Respondent maintains that the fair market value of the lots in controversy, i.e., 65 Tranquil Avenue, 100 Berryhill Road, and 155 Rockmont Road, at the time of their purchase by petitioner was $2,100, $2,045, and $4,000, respectively. Petitioner, on the other hand, contends that the fair market value of said lots was equal to the cost to the corporation. Alternatively, it is petitioner's position that the fair market value of the lots would be what some "investor" would give for all of the lots to hold for further selection, and that an investor would not have paid more than one-half of what he expected to eventually sell the lots for. In essence, he argues that, in determining fair market value of the lots at the time of their purchase, such value does not mean the amount that someone would pay for the separate lots on a long-term contract (which would permit the purchaser to forfeit small payments made and turn back the lot at any time), but means a bona fide sale for cash or for sufficient cash and security to make it a binding sale.

Respondent's determination of the fair market value of the lots in controversy is, of course, presumptively correct and the burden of proof is on petitioner to show error therein.

It is well established that fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy and sell and both being informed of the material considerations. Of course, the fair market value of property at a particular time is a question of fact to be determined from all of the circumstances connected with the transaction, and there is no single formula universally applicable in determining such value. *Meadow Land & Imp. Co.* v. *Commissioner*, 124 F. 2d 297 (C.A. 3, 1941), affirming a Memorandum Opinion of this Court.

Petitioner, in our judgment, has taken a mistaken view of the proper criteria of fair market value. Petitioner has not directed our attention to any case where fair market value was predicated on or limited to the amount that a hypothetical investor would pay for property, rather than the broader group referred to in the accepted definition as a "willing buyer." Fair market value does not mean, of course, that the whole world must be a potential buyer of the property offered, but only that there are sufficient available persons able to buy to assure a fair and reasonable price in the light of the circumstances affecting value. In considering the term "fair market value" as used in section 301, *supra*, we cannot restrict the market to dealers, investors, or any other limited groups. *Publicker* v. *Commissioner*, 206 F. 2d 250, 253 (C.A. 3, 1953), certiorari denied 346 U.S. 924 (1954), affirming a Memorandum Opinion of this Court.

As already indicated, we are not impressed with petitioner's argument to the effect that there was no realizable market value for the lots in question at the time they were sold to the stockholders and that respondent is merely trying to add the enhancement in value to said lots which occurred after their purchase and which the very purchase and building of a house by two of the stockholders helped to bring about. That one of the factors which petitioner had in mind when he purchased 65 Tranquil Avenue with the intention of erecting a house thereon was to boost sales of other lots in the subdivision clearly does not of itself prove that the lots were not readily salable on the open market or that the fair market value at that time was equal to the cost basis.

In all events, respondent's determination as to the fair market values of the properties conveyed to petitioners is prima facie correct, and the evidence adduced by petitioners is totally inadequate to support any adjustment of the values so determined. We have before us in this connection only the vague testimony of petitioner himself. Not only is it clear that he had no qualification to express an acceptable

opinion as to such values but, in addition, his testimony was inherently improbable and unreasonable. We add that, although bearing the burden of proof, petitioner did not offer as a witness, Taylor, the real estate dealer who had handled the sales of the lots in the subdivision, who apparently was well qualified to testify as to their value. The fact (referred to in petitioner's brief) that Taylor had been subpoenaed by respondent did not hinder petitioner from calling him as a witness if petitioner had desired to do so. In any event, we cannot assume under the circumstances that Taylor's testimony would have been favorable to petitioner's contention. *Wichita Terminal Elevator Co.* v. *Commissioner*, 162 F. 2d 513 (C.A. 10, 1947), affirming 6 T.C. 1158 (1946).

In the light of the foregoing, we hold that petitioner has failed to meet the burden of proof of error on the part of respondent in the latter's determination of the fair market value of the properties in question acquired by petitioner at the time of acquisition. Since it was stated on behalf of petitioner at the hearing that the cost to him of the properties, as determined by respondent, was not contested (and in view of our further holding, *infra*, in relation to available earnings), we sustain respondent's determination that unreported taxable dividends were distributed to petitioners in the amount of $6,664.71.

## II.

Petitioner contends that, assuming we hold (as we have, *supra*) that the purchase of the properties in question gave rise to taxable dividends within the intendment of section 301, the amount of the taxable dividends should be limited to $5,838.23 instead of $6,664.71, a difference of $826.48, on the theory that the corporation, to that extent, did not have sufficient earnings and profits from which to pay the amount of dividends determined by respondent. In support of his view, petitioner avers that the corporation (which commenced business on April 15, 1953) realized taxable income in the amount of $4,793.77 for the fiscal year ending March 31, 1954, and taxable income of $22,863.82 for fiscal year 1955. Petitioner argues that if the Federal income tax for fiscal year 1954 is deducted from the taxable income in that year of $4,793.77, undivided profits of $3,355.64 would remain available for distribution; and since purchases were made by all stockholders, one-third of said amount, or $1,118.55, is a limitation on the amount of dividends that could be charged against petitioner for the period prior to March 31, 1954. In the same vein, he maintains that the taxable income for the fiscal period ending March 31, 1955, was $22,863.82, and, when said amount is reduced by the Federal income tax for that year, there remain current earnings and profits of $16,004.67. Petitioner urges that if the lots purchased by the stockholders in January 1954 are held to be a distribution, then the accu-

mulated earnings ($3,355.64) for fiscal year 1954 would be reduced by the cost basis of said lots, and, there being three groups of properties (one group to each stockholder), the undivided profits for 1954 would be reduced by $1,845.60, leaving $1,510.04, which, added to $16,004.67, would make the total undivided profits at the end of the 1955 fiscal period $17,514.71. One-third of the latter amount, or $5,838.23, would be the limitation on dividends chargeable to petitioner. We cannot agree.

Since we have already determined that petitioner has failed to meet the burden of proving error on the part of the respondent in determining the fair market value of the lots in question at the time they were acquired by the petitioner, and since the lots were inventory assets of the corporation which must be deemed to have appreciated over cost to the extent so determined at the time purchased by petitioner, it is clear that under section 312(b)(1) and (2) of the 1954 Code,[2] a corresponding upward adjustment of the earnings and profits of the corporation is required, and also that at the moment of distribution a downward adjustment or charge to earnings and profits is necessary to the extent of the full market value of the inventory assets. The effect of such upward and downward adjustment is to insure that assets received by the shareholder will be taxed as a dividend, at least in the amount of any appreciation in value of the property, and at the same time to provide a uniform rule for charging earnings and profits by the amount of the cost to the distributing corporation of the item distributed. This rule is effective with respect to property distributed to shareholders on and after June 22, 1954. Sec. 391, 1954 Code.

Applying the aforesaid sections to the facts herein, it is clear that the difference between the cost basis and the fair market value of two of the three lots purchased by petitioner in 1954 (155 Rockmont Road and 100 Berryhill Road) must be added to earnings and profits of the corporation as of the end of fiscal year 1955. We note that the lot at 65 Tranquil Avenue was purchased on January 17, 1954, which is before the effective date of section 312(b), *supra*, and

---

[2] SEC. 312. EFFECT ON EARNINGS AND PROFITS.

　(b) CERTAIN INVENTORY ASSETS.—

　　(1) IN GENERAL.—On the distribution by a corporation, with respect to its stock, of inventory assets (as defined in paragraph (2)(A)) the fair market value of which exceeds the adjusted basis thereof, the earnings and profits of the corporation—

　　　(A) shall be increased by the amount of such excess; and

　　　(B) shall be decreased by whichever of the following is the lesser:

　　　　(i) the fair market value of the inventory assets distributed, or

　　　　(ii) the earnings and profits (as increased under subparagraph (A)).

　　(2) DEFINITIONS.—

　　　(A) INVENTORY ASSETS.—For purposes of paragraph (1), the term "inventory assets" means—

　　　　(i) stock in trade of the corporation, or other property of a kind which would properly be included in the inventory of the corporation if on hand at the close of the taxable year;

　　　　(ii) property held by the corporation primarily for sale to customers in the ordinary course of its trade or business; and

hence no upward adjustment of the earnings and profits of the distributing corporation is required. Sec. 391, *supra*. Respondent determined that the amounts of the dividends resulting from the two lots (155 Rockmont Road and 100 Berryhill Road) were in the respective amounts of $3,385 and $1,795, or a total of $5,180. It is clear that when said amount is added to the amount of undivided profits at the end of the 1955 period in the amount of $17,514.71— the amount used by petitioner in his calculation of earnings and profits which does not reflect the required upward adjustment— there is an aggregate of $22,694.71 of undivided profits available for distribution to the stockholders as dividends. There is no evidence before us as to the fair market value of the lots sold to the other shareholders, and to this extent, petitioner has again failed to meet his burden of proof because any appreciation in value of the lots transferred to the other stockholders would likewise have to be added to earnings and profits available for distribution. Assuming the most favorable position from petitioner's viewpoint, however (i.e., that the dividends were distributed exactly on a pro rata basis of one-third to each shareholder), it is nevertheless clear that there were sufficient earnings and profits available for the payment of the full amount of dividends determined by respondent.

In view of the foregoing, and the record as a whole, we find as a fact that petitioners received a dividend from Lake Forest, Inc., in the amount of $6,664.71 during the taxable year 1954.

*Decision will be entered under Rule 50.*