JASON L. HONIGMAN AND EDITH HONIGMAN, ET AL.,[1] PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 3892–68—3898–68.   Filed March 24, 1971.

---

[1] The following cases have been consolidated for the purpose of trial: Jason Honigman, transferee of the assets of National Building Corp., docket No. 3893–68; Edith Honigman, transferee of the assets of National Building Corp., docket No. 3894–68; Ben L. Silberstein, transferee of the assets of National Building Corp., docket No. 3895–68; Gertrude Levin, transferee of the assets of National Building Corp., docket No. 3896–68; Harry Galperin, transferee of the assets of National Building Corp., docket No. 3897–68; and Sarah H. Galperin, transferee of the assets of National Building Corp., docket No. 3898–68.

*Miles Jaffe*, for the petitioners.
*John H. Menzel* and *Robert T. Hollohan*, for the respondent.

WITHEY, *Judge:* The Commissioner has determined deficiencies in petitioners' income taxes in the amounts and for the taxable years shown below:

| Petitioner | Docket No. | Taxable year ended | Amount |
|---|---|---|---|
| Jason L. and Edith Honigman | 3892-68 | Dec. 31, 1963 | $541,539.40 |
| Jason Honigman, transferee | 3893-68 | | |
| Edith Honigman, transferee | 3894-68 | | |
| Ben L. Silberstein, transferee | 3895-68 | May 31, 1960 | 156,074.97 |
| Gertrude Levin, transferee | 3896-68 | May 31, 1962 | 46,425.94 |
| Harry Galperin, transferee | 3897-68 | May 31, 1963 | 260,854.10 |
| Sarah H. Galperin, transferee | 3898-68 | | |

The transferee petitioners in docket No. 3893-68 through 3898-68 concede their liability for any income tax deficiency of National Building Corp. Due to certain concessions made by both parties, the primary issues to be decided are: (1) Whether the transfer in May 1963 of ownership of the Pantlind Hotel property from National Building Corp. to Pantlind Hotel Co. was in part a dividend distribution to Jason and Edith Honigman to the extent of the excess, if any, of the fair market value of the hotel over the amount received by National Building Corp. from the Honigmans; (2) whether, if there was a dividend distribution, the dividend is a liquidating distribution taxable at capital gains rates or as ordinary income; (3) whether the loss of $806,888.30 which National allegedly realized on the sale of the hotel, or any part thereof, was deductible by National in that year; (4) whether expenditures by National of $87,294.27 in the fiscal year ended May 31, 1962, for the replacement of portions of the floor of the garage area of the First National Building were currently deductible as ordinary and necessary business expenses or nondeductible capital expenditures; and (5) whether expenditures of National of $10,976.44 in the fiscal year ended May 31, 1963, for services rendered in the course of a physical survey and recommendation of a program for further need for replacement of portions of the

floor throughout the garage area of the First National Building were currently deductible as ordinary and necessary business expenses or nondeductible capital expenditures.

FINDINGS OF FACT

Each of the petitioners in the cases designated as docket Nos. 3893–68 through 3898–68 was a stockholder and distributee of the assets of National Building Corp., hereinafter referred to as National, all of the assets of which were distributed to its stockholders, including petitioners, in the complete liquidation of National. The Federal income tax returns of National for the years in issue were filed with the district director of internal revenue at Detroit, Mich. At the time of filing the petitions herein, Jason L. and Edith Honigman and Gertrude Levin resided at Detroit, Mich., Harry and Sarah Galperin resided at Miami Beach, Fla., and Ben L. Silberstein resided at Beverly Hills, Calif.

National was formed in 1946 as a Michigan corporation with its principal office at Detroit, Mich. Its principal business was the ownership and operation of commercial real estate. From its incorporation and continuing through all relevant dates herein, the common shares of National, its sole outstanding capital stock, were owned substantially in the following proportions: Jason L. Honigman, his wife Edith, and their children and grandchildren (Honigman family), about 35 percent; Ben L. Silberstein, his former wife Gertrude Levin, and their children (Silberstein family), about 35 percent; Harry Galperin and his wife Sarah (Galperin family), about 20 percent; and the remaining 10 percent of the common stock was owned by a number of other individuals in relatively small proportions. There was no family relationship between the Honigman family and any member of either the Silberstein or Galperin families, nor were there any business relationships between the Honigman family and any members of either the Silberstein or Galperin families other than their relationship as stockholders, directors, and officers of National.

At all dates relevant herein, the following three persons were the directors of National and held the offices shown:

Ben L. Silberstein_____ President and treasurer
Jason L. Honigman_____ Vice president and secretary
Harry Galperin_____ Vice president

Real estate known as the First National Building was purchased by National in 1946 shortly after its incorporation.

During the year 1951, National acquired the stock of the Pantlind Hotel Co. (Delaware Pantlind), a Delaware corporation. At that time, Delaware Pantlind owned the Pantlind Hotel located in Grand Rapids, Mich. The hotel is a 10-story building with approximately 550 guestrooms and occupies an entire block located in the central business district in Grand Rapids. During the years in issue, in addition to guestrooms, the hotel had various specialty stores, four restaurants on the main floor, and a cafeteria and restaurant in the basement. A corner section of the hotel building, approximately 20 percent of the total square footage of the building, was owned by the Old Kent Bank which occupied the first floor, mezzanine, and basement areas and leased all of the upper floors to the owners of the hotel under a 99-year lease under the terms of which the tenant paid $16,500 annual rent. The lease provided the rental price was to be adjusted at the end of each 10-year period of the lease, based on changes in the fair market value of the property. The 10-year period existing during the years in issue was to expire in 1963. In 1952, the Pantlind Hotel was transferred as a dividend distribution to National by Delaware Pantlind and at the same time an agreement was entered into between National and Delaware Pantlind under the terms of which Delaware Pantlind was employed by National to operate the hotel and submit monthly financial reports and transfer to National the net income derived from the operations of the hotel. In return for these duties, Delaware Pantlind received a management fee equal to 3 percent of the entire gross income from the hotel operations. The management agreement remained in effect until National transferred the hotel on May 27, 1963.

A schedule of National's financial operations for the fiscal years ended May 31, 1959 through 1962, and for the period June 1, 1962, to May 26, 1963, is shown below:

PANTLIND HOTEL DIVISION

NATIONAL BUILDING CORPORATION

Statement of Operations

| | June 1, 1962 to May 26, 1963 | Fiscal years ended May 31— | | | |
| --- | --- | --- | --- | --- | --- |
| | | 1962 | 1961 | 1960 | 1959 |
| Income: | | | | | |
| Room sales | $753,118 | $741,028 | $733,978 | $775,747 | $719,688 |
| Food sales | 1,360,780 | 1,352,072 | 1,354,957 | 1,403,542 | 1,316,659 |
| Beverage sales | 437,444 | 407,841 | 410,818 | 457,050 | 424,348 |
| Telephone | 34,992 | 36,113 | 41,386 | 47,344 | 45,604 |
| Barbershop | 16,375 | 18,444 | 19,189 | 18,358 | 18,735 |
| Guest laundry | 1,400 | 807 | 793 | 961 | 978 |
| Service charges | 4,329 | 4,689 | 4,469 | 4,540 | 3,231 |
| Cigar stand concession | 4,186 | 4,296 | 4,861 | 5,515 | 5,383 |
| Civic auditorium concession | 1,748 | 21,462 | 24,272 | 24,672 | |
| Store rentals | 36,313 | 21,720 | 20,093 | 20,303 | 17,842 |
| Other income | 8,904 | 9,961 | 10,150 | 10,929 | 9,541 |
| Total income | 2,659,489 | 2,618,433 | 2,624,966 | 2,768,961 | 2,562,009 |

| | June 1, 1962 to May 26, 1963 | Fiscal years ended May 31— | | | |
|---|---|---|---|---|---|
| | | 1962 | 1961 | 1960 | 1959 |
| **Costs and expenses:** | | | | | |
| Rooms and unapportioned payroll | $444,743 | $431,317 | $454,547 | $436,952 | $395,266 |
| Rooms direct and indirect expense | 105,313 | 101,472 | 69,496 | 59,658 | 57,438 |
| Food payroll | 610,899 | 592,931 | 587,330 | 573,885 | 544,085 |
| Beverage payroll | 55,193 | 52,684 | 52,198 | 52,250 | 43,843 |
| Food cost—net of employees' meals | 604,440 | 592,561 | 598,001 | 612,426 | 583,511 |
| Beverage cost | 152,662 | 137,460 | 143,621 | 154,098 | 145,062 |
| Food and beverage expenses | 80,117 | 84,962 | 78,834 | 77,498 | 70,513 |
| Telephone cost | 42,010 | 43,671 | 48,740 | 52,897 | 51,157 |
| Barbershop payroll | 13,893 | 15,202 | 15,680 | 14,997 | 14,708 |
| Civic concession expense | 5,099 | 24,792 | 24,627 | 19,953 | |
| Officers' salaries | 33,770 | 463 | | 792 | 266 |
| Administrative and general | 93,482 | 91,627 | 84,751 | 73,561 | 71,744 |
| Advertising and promotion | 26,886 | 29,382 | 28,260 | 33,530 | 32,350 |
| Heat, light, and power | 122,275 | 125,638 | 122,450 | 115,455 | 110,825 |
| Repairs and maintenance | 63,765 | 51,525 | 111,887 | 86,724 | 82,086 |
| Taxes—local | 66,483 | 80,185 | 81,576 | 65,173 | 60,738 |
| Ground rent | 16,500 | 16,500 | 16,500 | 16,500 | 16,500 |
| Total costs and expenses | 2,537,530 | 2,472,372 | 2,518,498 | 2,446,349 | 2,280,092 |
| Operating income | 121,959 | 146,061 | 106,468 | 322,612 | 281,917 |
| **Deduct:** | | | | | |
| Interest | 41,217 | 37,811 | 39,963 | 47,928 | 54,309 |
| Depreciation | 105,952 | 109,920 | 120,376 | 114,585 | 117,391 |
| Management fees | 75,561 | 79,061 | 79,149 | 84,699 | 77,471 |
| Local tax adjustment on sale | (78,917) | | | | |
| Insurance adjustment on sale | (14,909) | | | | |
| Net deductions | 128,904 | 226,792 | 239,488 | 247,212 | 249,171 |
| Profit (or loss) per audit statements | (6,945) | (80,731) | (133,020) | 75,400 | 32,746 |

A schedule of the Pantlind Hotel's room, food, and beverage statistics for the same years is shown below:

### PANTLIND HOTEL DIVISION

Room, Food, and Beverage Statistics

| | June 1, 1962, to May 26, 1963 | Fiscal year ended May 31— | | | |
|---|---|---|---|---|---|
| | | 1962 | 1961 | 1960 | 1959 |
| **Room sales:** | | | | | |
| Guestrooms | $740,846.08 | $727,380.92 | $721,412.16 | $763,529.89 | $790,373.87 |
| Public rooms | 12,272.35 | 13,647.65 | 12,566.15 | 12,217.20 | 10,314.60 |
| Total | 753,118.43 | 741,028.57 | 733,978.31 | 775,747.09 | 719,688.47 |
| Rooms in hotel | (1) | (1) | (1) | 577 | 577 |
| Rooms available | (1) | (1) | (1) | 211,182 | 210,605 |
| Rooms occupied | 74,574 | 74,579 | 76,639 | 87,266 | 81,422 |
| Guests (house count) | 102,905 | 100,696 | 102,851 | 119,939 | 111,354 |
| Percentage of occupancy | 35.84 | 35.64 | 36.47 | 41.32 | 38.66 |
| Percentage of double occupancy | 37.99 | 35.02 | 34.20 | 37.44 | 36.76 |
| Average rate per room | $9.93 | $9.75 | $9.41 | $8.75 | $8.71 |
| Average rate per guest | 7.20 | 7.22 | 7.01 | 6.37 | 6.37 |
| Percentage of convention occupancy | 55.03 | (1) | (1) | (1) | (1) |

See footnote at end of table.

| | June 1, 1962, to May 26, 1963 | Fiscal year ended May 31— | | | |
| --- | --- | --- | --- | --- | --- |
| | | 1962 | 1961 | 1960 | 1959 |
| **Food sales:** | | | | | |
| Knife and Fork | $287,993.67 | $284,052.60 | $289,613.64 | $298,016.52 | $281,203.49 |
| Cafeteria | 191,452.95 | 195,575.96 | 214,330.67 | 222,016.76 | 199,483.81 |
| Charcoal Inn | 233,854.50 | 188,351.35 | 188,543.93 | 198,308.40 | 186,051.85 |
| Pub | 107,417.01 | 109,858.85 | 113,010.47 | 133,103.95 | 127,104.11 |
| Cypress Cellar | 151,700.50 | 156,368.31 | 164,445.10 | 177,075.55 | 172,511.78 |
| Backroom Saloon | 7,020.97 | | | | |
| Room service | 636.55 | 9,125.85 | 415.25 | 378.00 | 261.55 |
| Banquets | 380,703.68 | 408,738.75 | 384,598.31 | 374,642.86 | 350,042.60 |
| Total food sales | 1,360,779.83 | 1,352,071.67 | 1,354,957.37 | 1,403,542.04 | 1,316,659.19 |
| **Beverage sales:** | | | | | |
| Charcoal Inn | 43,436.99 | 39,303.10 | 40,751.10 | 44,231.29 | 43,452.75 |
| Pub | 164,215.82 | 169,290.85 | 159,806.13 | 178,210.41 | 164,213.21 |
| Cypress Cellar | 105,246.63 | 107,812.30 | 112,997.54 | 125,049.08 | 120,541.97 |
| Backroom Saloon | 38,404.83 | | | | |
| Bottle sales | 18,047.40 | 15,214.62 | 21,025.24 | 25,664.56 | 29,394.67 |
| Room service | 13,838.27 | 13,927.12 | 14,151.72 | 18,486.98 | 16,561.25 |
| Banquets | 54,253.85 | 62,293.40 | 62,086.26 | 65,407.58 | 50,183.76 |
| Total beverage sales | 437,443.79 | 407,841.39 | 410,817.99 | 457,049.90 | 424,347.61 |

¹ Not available.

As of May 27, 1963, a downtown urban renewal development was in progress covering an area of approximately 26 acres just north and east of the Pantlind Hotel. Properties were acquired under the urban renewal program beginning on August 15, 1961.

Beginning in early 1963, National entered into a series of agreements which ultimately resulted in its complete liquidation. On February 11, 1963, National entered into a preliminary agreement to sell the First National Building. On May 6, 1963, National and Pantlind Hotel Co. (hereinafter Michigan Pantlind), a newly organized Michigan corporation, all of the capital stock of which was then owned by Edith Honigman, entered into a sale agreement pursuant to which, on May 27, 1963, National delivered title to and possession of the Pantlind Hotel to Michigan Pantlind which in return paid National $661,280.21, consisting of Michigan Pantlind's assumption of the mortgage indebtedness in the hotel property of $589,754.35, assumption of $21,525.86 of unpaid current real estate and personal property taxes, plus $50,000 in cash. For the calendar year 1963, Michigan Pantlind was a subchapter S corporation, the profit or loss of which was required to be reflected in the 1963 joint income tax return of petitioners Jason and Edith Honigman. At the date of sale, National's adjusted cost basis for determining gain or loss of the hotel was $1,468,168.51. On May 29, 1963, Pantlind Hotel Co. paid National an additional $37,911.05, representing a net adjustment to the above purchase price to account for the following items:

Amounts credited to National:

| | | |
|---|---|---|
| Food inventory | $29, 786. 93 | |
| Beverage inventory | 20, 687. 78 | |
| Insurance adjustments | 14, 909. 49 | |
| | | $65, 384. 20 |

Amounts credited to Michigan Pantlind:

| | | |
|---|---|---|
| Allowance for vacation pay | 25, 000. 00 | |
| Accrued interest on mortgage | 2, 473. 15 | |
| | | 27, 473. 15 |
| Net adjustment | | 37, 911. 05 |

On August 12, 1963, National adopted a plan of liquidation which qualified as a liquidation under section 337. Pursuant to the plan of liquidation, certain assets of National, including the First National Building, were sold and the proceeds thereof, together with all of the remaining assets of National, were distributed to its stockholders on or before April 24, 1964. The liquidating distribution was $147.65 per share.

At the time National entered into the preliminary agreement to sell the First National Building on February 11, 1963, the directors were aware that the Pantlind Hotel which they were desirous of selling would be sold at a loss, while the other assets would be sold at a substantial gain. They therefore decided to sell the Pantlind Hotel and then adopt and pursue a plan of complete liquidation in accordance with section 337 which would shield the corporation from the recognition of the substantial gains to be realized in the sale of the remaining assets.

Following 4 months of unsuccessful efforts to procure a purchaser, in April 1963, the directors of National held a meeting during which they further discussed the desirability of selling the hotel and at a more suitable purchase price. The previous selling efforts included contact with several hotel chain representatives and hotel owners, real estate, and hotel brokers. Most of these people were contacted by Honigman in the form of telephone or brief letter inquiries. No appraisal of the hotel was made nor was a sales brochure prepared. During the negotiations with these people, the indicated selling price of the hotel ranged from $200,000 to $250,000 above the existing mortgage on the hotel property. During the meeting, Honigman suggested selling the hotel for a "nominal" sum of $50,000 above the existing mortgage. This price had not previously been offered to outside prospective purchasers, nor was such price ever offered to them. Silberstein

initially indicated an interest in purchasing the hotel for the afore-mentioned "nominal" sum, but declined to do so because of personal reasons. Honigman later decided to buy the hotel at the same price offered to Silberstein. The transaction was completed on May 27, 1963, at which time Michigan Pantlind purchased the hotel as outlined above.

While owned by National, the Pantlind Hotel property was encumbered by a mortgage executed in 1952 and originally bearing interest at 4¾ percent. The mortgage matured in 1962 at which time it was extended an additional 2 years and the interest rate was increased to 6 percent. The mortgage was payable in monthly installments of $6,462 each, inclusive of principal and interest, and the entire unpaid balance of the mortgage matured and was payable on August 31, 1964.

In October 1964, Michigan Pantlind paid the entire balance due on the mortgage encumbering the hotel property. The payment was made with the proceeds of a new $550,000 mortgage loan secured by a real estate mortgage on the hotel property plus Jason Honigman's personal guaranty of the first $175,000 payable under the loan agreement.

On November 18, 1964, Michigan Pantlind sold to three Roberts brothers 2,400 shares of its common stock out of its total capital stock of 7,500 shares then issued and outstanding. The sales price was $10 per share which was the same price per share paid therefor by Edith Honigman upon incorporation of the Michigan Pantlind in May 1963, prior to purchasing the Pantlind Hotel. All of the Roberts brothers were employees of Michigan Pantlind at the time of the sale and for many years prior thereto had been employed by Delaware Pantlind. On December 21, 1964, Michigan Pantlind purchased at a price of $137,500 from Old Kent Bank, the corner portion of the Pantlind Hotel building, the upper floors of which had for many years prior thereto been leased by the owners of the hotel from Old Kent Bank.

During its fiscal year ended May 31, 1962, National paid $87,294.27 for materials and labor for the replacement of portions of the floor of the parking garage area of the First National Building and during the year ended May 31, 1963, paid $10,976.44 for services rendered in the course of a physical survey and recommendation of a program for further need for replacement of portions of the floor throughout the parking garage area of the First National Building. National deducted these sums as current ordinary and necessary business expenses in its income tax returns for those periods.

The Pantlind Hotel's financial operations improved subsequent to its acquisition by Michigan Pantlind primarily due to better management, progress in the urban renewal program, and the addition of two profitable restaurants, the Backroom Saloon and the Upstairs Saloon.

A schedule of Pantlind Hotel Co.'s financial operations for the period May 27 to December 31, 1963, and for the years ended December 31, 1964 and 1965, is shown below:

### PANTLIND HOTEL CO.

Statement of Operations

| | 1965 | 1964 | May 27 to Dec. 31, 1963 |
|---|---|---|---|
| **Income:** | | | |
| Room sales | $714,061 | $732,728 | $387,503 |
| Food sales | 1,488,024 | 1,421,343 | 773,301 |
| Beverage sales | 542,464 | 548,661 | 303,190 |
| Telephone | 30,708 | 35,209 | 19,043 |
| Barbershop | | 2,394 | 8,768 |
| Guest laundry and valet | 1,272 | 1,407 | 883 |
| Service charges | 11,333 | | |
| Cigar stand concession | 1,769 | 3,666 | 2,138 |
| Store rentals | 51,181 | 46,944 | 26,432 |
| Other income | 15,138 | 17,943 | 10,967 |
| Total income | 2,855,950 | 2,810,295 | 1,532,225 |
| **Costs and expenses:** | | | |
| Rooms payroll | 197,343 | 194,666 | 109,581 |
| Laundry payroll | 47,461 | 45,282 | 24,012 |
| Rooms and house expenses | 100,262 | 100,801 | 57,106 |
| Food payroll | 629,232 | 621,011 | 355,020 |
| Food cost—employees' meals | 606,535 | 582,685 | 315,833 |
| Beverage payroll | 73,825 | 75,537 | 40,741 |
| Beverage cost | 173,427 | 181,767 | 99,156 |
| Food and beverage expense | 88,375 | 92,142 | 56,098 |
| Telephone cost | 59,335 | 47,382 | 24,230 |
| Telephone payroll | 14,241 | 23,505 | 14,142 |
| Barbershop payroll | | 2,087 | 7,464 |
| Officers salaries | 51,000 | 50,271 | 27,870 |
| Administrative payroll | 23,216 | 22,178 | 12,050 |
| Administrative expense | 105,505 | 106,858 | 68,936 |
| Advertising and promotion | 18,943 | 20,348 | 14,537 |
| Heat, light, and power | 102,965 | 105,166 | 64,905 |
| Maintenance payroll | 112,692 | 109,076 | 75,807 |
| Maintenance expense | 62,811 | 55,235 | 35,808 |
| Local taxes | 54,369 | 56,755 | 145,340 |
| Ground rent | 16,500 | 16,500 | 9,625 |
| Payroll taxes—unapportioned | 19,998 | 22,871 | 14,248 |
| Total costs and expenses | 2,558,035 | 2,532,123 | 1,572,509 |
| Operating income | 297,915 | 278,172 | (40,284) |
| **Deduct:** | | | |
| Interest: | | | |
| Mortgage | 31,826 | 33,392 | 20,620 |
| Other | 3,468 | 7,221 | 3,540 |
| Depreciation | 81,708 | 83,974 | 39,420 |
| Total deductions | 117,002 | 124,587 | 63,580 |
| Net profit (or loss) before income taxes | 180,913 | 153,585 | (103,864) |

A schedule of room, food, and beverage statistics for the same periods is shown below:

| | 1965 | 1964 | May 26 to Dec. 31, 1963 |
|---|---|---|---|
| **Room sales:** | | | |
| Guestrooms | $701,798.60 | $725,435.55 | $382,461.15 |
| Public rooms | 12,262.50 | 7,292.60 | 5,042.00 |
| Total | 714,061.10 | 732,728.15 | 387,503.15 |
| Rooms in hotel | 565 | 566 | 577 |
| Rooms available | 206,222 | 207,156 | [1] 126,940 |
| Rooms occupied | 72,906 | 77,107 | 39,584 |
| Guests (house count) | 101,483 | 105,996 | 54,153 |
| Percentage of occupancy | 35.35% | 37.22% | 31.71% |
| Double occupancy | 39.20% | 37.47% | 36.81% |
| Average rate per room | $9.63 | $9.41 | $9.66 |
| Average rate per guest | 6.92 | 6.84 | 7.06 |
| Percent of convention occupancy | 47.84% | 44.03% | 39.82% |
| **Food sales:** | | | |
| Knife and Fork | $294,068.41 | $300,442.91 | $173,253.92 |
| Cafeteria | 190,883.78 | 185,201.44 | 100,602.84 |
| Charcoal Inn | 235,985.74 | 230,000.50 | 137,265.60 |
| Pub | 108,386.82 | 104,351.92 | 60,260.60 |
| Cypress Cellar | 138,558.21 | 126,095.96 | 60,226.76 |
| Backroom Saloon | 42,815.72 | 32,532.29 | 22,371.20 |
| Upstairs Saloon | 9,062.45 | 13,336.15 | |
| Room service | 629.30 | 651.65 | 1,253.55 |
| Banquets | 467,634.07 | 428,730.53 | 218,066.62 |
| Total food sales | 1,488,024.50 | 1,421,343.35 | 773,301.09 |
| **Beverage sales:** | | | |
| Charcoal Inn | 40,320.90 | 41,085.55 | 25,195.20 |
| Pub | 142,569.41 | 144,466.15 | 80,763.18 |
| Cypress Cellar | 72,147.66 | 74,756.60 | 36,766.53 |
| Backroom Saloon | 162,513.27 | 153,711.43 | 114,598.31 |
| Upstairs Saloon | 37,895.56 | 48,633.43 | |
| Bottle sales | 12,065.25 | 12,929.72 | 5,257.30 |
| Room service | 4,973.20 | 9,074.14 | 4,575.85 |
| Banquets | 69,979.02 | 64,004.05 | 36,063.46 |
| Total beverage sales | 542,464.27 | 548,661.07 | 303,219.83 |

[1] 1963 available rooms estimated, based on annual figures.

In his notices of deficiency to petitioners Jason and Edith Honigman, respondent determined that the fair market value of the Pantlind Hotel on the date of the sale was $1,300,000, and consequently that the Honigmans received a taxable dividend equal to the difference between $1,300,000 and the amount they paid for the hotel. Respondent also asserted deficiencies against petitioners as transferees of the assets of National based upon his disallowance of both the loss deduction claimed by National on the sale of the hotel and the expense deductions claimed by National for the expenditures with respect to the garage floor areas of the First National Building.

### OPINION

Section 316 of the Code defines a dividend as "any distribution of property made by a corporation to its stockholders—(1) out of its earn-

ings and profits." Property is defined in section 317 as "money, securities, and any other property."

Section 1.301–1(j), Income Tax Regs., provides in pertinent part:

> If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * *

This regulation has repeatedly received Court approval. See, e.g., *Lester E. Dellinger*, 32 T.C. 1178 (1959).

Section 301 of the Code provides in pertinent part:

> (a) In General.—Except as otherwise provided in this chapter, a distribution of property * * * made by a corporation to a shareholder with respect to its stock shall be treated in the manner provided in subsection (c).

> &ast;  &ast;  &ast;  &ast;  &ast;  &ast;  &ast;

> (c) Amount Taxable.—In the case of a distribution to which subsection (a) applies—

>> (1) Amount constituting dividend—That portion of the distribution which is a dividend (as defined in section 316) shall be included in gross income.

Since we have property transferred by a corporation (National) to a noncorporate shareholder,[2] the questions for decision are: (1) Whether the hotel was transferred for an amount less than its fair market value, and, if so (2) whether the difference between the amount paid for the hotel and its fair market value is a dividend under section 316.

The evidence concerning the fair market value of the hotel as of May 27, 1963, consists primarily of expert witnesses' testimony and their accompanying appraisal reports. Since no representative comparative sales were available, the experts for both parties estimated the value of the hotel by means of the capitalized earnings approach, each expert considering that the best use of the property was as an operating hotel unit. Respondent's two experts estimated the value of the hotel to be $1,300,000 and $967,000. Three experts testifying on petitioners' behalf estimated the value of the hotel to be $700,000, $659,850, and $625,000, and petitioners' fourth expert estimated the land upon which the hotel was built to be worth $220,000. For the reasons outlined below, we have determined that the fair market value of the Pantlind Hotel at the date it was purchased by the Honigmans was $830,000. The

---

[2] Although in form, the sale was to Michigan Pantlind, a corporation, the parties both at trial and on brief have treated Edith Honigman, who owned 100 percent of Michigan Pantlind's stock at all times material to this case, as the purchaser of the hotel. In his notice of deficiency to the Honigmans, respondent explained his determination that a portion of the deficiency was "the result of your *indirect purchase* of this property [the hotel] for less than its fair market value." (Emphasis added.)

primary reasons for the different estimates of value were experts' different opinions relative to the proper factors and figures to be used in applying the capitalization-of-earnings approach. After reviewing the testimony and appraisal reports, we valued the hotel applying the capitalization-of-earnings approach using an estimated 5-year average of available net earnings figure of $135,000, a 15-year remaining useful life, a 5-percent interest factor, and a capitalization rate of 9 percent.

The major difference of opinion between the witnesses concerned the correct estimate of available earnings.

Both parties argued at length concerning the correct net earnings figure to be used in applying the capitalization of earnings approach. The hotel's earnings decreased sharply during the years 1962 and 1963, and respondent contended the earnings figures for those years were not representative and should therefore be ignored in projecting the hotel's future earning capacity. Petitioners contended on the other hand that those earnings figures should weigh heavily because they were the most recent earnings figures available and were indicative of future earning capacity. We feel that in light of the many different reasons advanced by both parties to account for the large drop in earnings for the years 1962 and 1963, an average figure based upon the earnings for each of the 5 years immediately preceding the sale of the hotel is the most reasonable approximation of the estimated future earning capacity of the hotel.

As further support for what petitioners allege to be the true fair market value of the hotel, we are asked to consider the subsequent sale to the Roberts brothers of approximately a one-third interest in the hotel at the same price paid by the Honigmans and the purchase for $137,500 of the portion of the building previously owned by the Old Kent Bank. We do not consider these transactions persuasive to a determination of the fair market value of the hotel as of May 27, 1963. In our opinion and in the opinions of the experts (who used the capitalization-of-earnings approach because they could find no comparative sales), these transactions were not representative comparative sales and were of no probative value in estimating the value of the hotel.

Petitioners argue alternatively that notwithstanding a finding of fact that the price paid was less than the fair market value of the hotel, no dividend resulted because no dividend was intended.[3] They rely heavily upon the facts that Honigman was only a minority shareholder and that National allegedly had a valid business purpose for the transaction.

Respondent argues that the intent of the parties to the transaction is not controlling in determining whether the transfer resulted in a divi-

---

[3] Petitioners do not dispute that National had adequate earnings and profits to support the finding of a dividend in the amount stated in the deficiency notice.

dend and, therefore, that the sole question on the issue is whether, as a matter of fact, the fair market value of the Pantlind Hotel as of the date of sale was in excess of the price paid.

Section 316, *supra*, provides that a dividend is a distribution by a corporation out of its earnings and profits. Our only inquiry herein is whether National transferred to the Honigmans without cost a portion of its earnings and profits. The intent of the parties to the transaction is not controlling, nor do we consider it material that the transfer was in the form of a sale, or that no express dividend was declared. *Lester E. Dellinger*, *supra*. To the extent the fair market value exceeded the price paid, there was a distribution to the Honigmans of National's earnings and profits and consequently a taxable dividend in the same amount.

Petitioners' argument that the circumstances of the transaction, i.e., the unsuccessful efforts to find a willing "outside" purchaser, Silberstein's refusal to purchase the hotel at the same price paid by the Honigmans, and the fact that Honigman was a minority shareholder, which circumstances they contend show a bona fide sale at arm's length, are material to determining whether the transaction constituted a dividend is without merit. In our opinion, and the cases relied upon by petitioners are in agreement therewith, the surrounding circumstances may be material to a determination of the property's fair market value, but where, as here, the value of the property has already been determined, such facts are of little if any help in deciding whether a dividend resulted.

Also, petitioners' reliance upon National's alleged valid business purpose for the transaction is without merit. We are convinced that whatever National's business purpose may have been, the transaction was completed at that time primarily to entitle National to recognize the loss to be realized on the sale of the hotel. The directors had no hope of selling the hotel for more than its adjusted basis of approximately $1,400,000, and had they sold the hotel after they had adopted the liquidation plan, the loss could not have been recognized. These facts indicated the transaction was a "forced sale" and not a bona fide sale at arm's length.

The next issue is whether, as petitioners contend in the alternative, the dividend is a distribution in partial liquidation (as defined in section 346) of National and therefore is taxable as a capital gain. Secs. 331, 1221. Respondent argues that section 346 is not applicable because the transaction was not pursuant to a plan of partial liquidation, nor did the transaction include a redemption of National's stock. We agree. This Court has previously held a stock redemption to be a prerequisite to the applicability of section 346. *Oscar E. Baan*, 51 T.C. 1032 (1969). Petitioners failed even to contend that the transaction in issue included

a redemption of stock, but in any event, it is clear that the only redemption of National's stock that occurred was pursuant to the plan of *complete* liquidation adopted August 12, 1963, more than 2 months after the sale of the hotel.

The next issue is whether National is entitled to deduct any loss on the sale of the Pantlind Hotel to the Honigmans. Respondent argues that since the hotel was transferred for an amount less than its fair market value that the transaction is to be treated in its *entirety* as a distribution to which section 301 applies. Sec. 1.301-1(j), Income Tax Regs., *supra*. He argues further that since under section 311 a corporation does not recognize gain or loss upon a distribution to which section 301 applies, National is not entitled to deduct any loss on the transfer of the Pantlind Hotel. Respondent's reliance upon section 1.301-1(j), Income Tax Regs., as support for his contention on this issue is misplaced because that regulation states clearly that the amount of the distribution to which section 301 is deemed to apply (and hence the amount deemed to be recognized as a dividend) is the difference between the amount paid for the property and its fair market value. In our opinion the transfer of the hotel is to be treated for tax purposes as in part a dividend in an amount equal to the difference between the fair market value of the hotel and the amount paid to acquire it and in part a sale. National realized a loss on the sale and is therefore entitled to deduct as a loss the difference between the adjusted basis and fair market value of the hotel. *W. G. Maguire & Co.*, 20 T.C. 20 (1953).

The next issue is whether certain expenditures incurred and paid by National are deductible as ordinary and necessary business expenses. In its fiscal year 1962, National expended the sum of $87,294.27 for materials and labor for replacing portions of the floor of the garage area of the First National Building and in fiscal 1963, National expended the sum of $10,976.44 for engineering services in the course of a physical survey and recommendation of a program for further need for replacing portions of the floor of the same garage area.

We will consider first the deductibility of the expenditures in 1962 for materials and labor. Petitioner contends the expenditures are ordinary and necessary business expenses in the nature of repairs. Respondent contends the expenditures are nondeductible capital expenditures because they arrested deterioration and constituted permanent betterment and improvements. Respondent relies heavily upon section 1.162-4, Income Tax Regs., which provides:

Sec. 1.162-4   Repairs.

The cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense, provided the cost of acquisition or production or the gain or loss basis of the taxpayer's plant, equipment,

or other property, as the case may be, is not increased by the amount of such expenditures. Repairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept.

This Court has previously stated that it is necessary to consider the purpose for which an expenditure is made in order to determine whether such expenditure is capital in nature or is a current repair expense. In *Illinois Merchants Trust Co., Executor*, 4 B.T.A. 103 (1926), we stated:

In determining whether an expenditure is a capital one or is chargeable against operating income, it is necessary to bear in mind the purpose for which the expenditure was made. To repair is to restore to a sound state or to mend, while a replacement connotes a substitution. A repair is an expenditure for the purpose of keeping the property in an ordinarily efficient operating condition. It does not add to the value of the property, nor does it appreciably prolong its life. It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired. Expenditures for that purpose are distinguishable from those for replacements, alterations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use. The one is a maintenance charge, while the others are additions to capital investment which should not be applied against current earnings. * * *

The alleged repairs in this case were of two types: the replacement of entire 16 feet by 16 feet floor bay areas and the patchwork of smaller floor areas. The repair work entailed tearing up the damaged portions of the concrete floor and replacing the removed portions with new reinforced concrete. In some instances, new steel beams were either substituted for the old beams or welded alongside of them.

We hold that the expenditures related to the replacement of entire 16 feet by 16 feet floor bay areas are capital in nature and therefore nondeductible. The replacement of the floor bay areas required a substantial amount of structural work including the use of steel reinforcing rods and new steel beams. The new floor bay areas represented replacements and improvements, not merely repairs which kept the building in an ordinarily efficient operating condition. *Illinois Merchants Trust Co., Executor, supra.*

While we find the expenditures related to the patching of smaller floor areas to be in the nature of deductible repairs, petitioners have failed to prove what portion of the expenditures was incurred for the patchwork repairs or to give us a reasonable basis upon which to allocate a portion of the total expenditures to the patchwork. Therefore, under the principle of *Cohan* v. *Commissioner*, 39 F. 2d 540 (C.A. 2, 1930), we allocate $2,500 to such repairs and hold such amount to be currently deductible.

We consider now the expenditures in fiscal 1963 for engineering services. Respondent contends this expenditure was capital in nature,

but is nondeductible in any event because it was incidental to the sale of the First National Building in the section 337 liquidation. We agree that the expenditure was capital in nature at least to the extent the survey related to recommended floor replacements amounting to capital improvements. For want of proof of what portion, if any, of the survey that related to future noncapital repair work, we must assume that all of the survey expenditures related to recommended floor replacements amounting to capital improvements and consequently that all of those expenditures are capital. Accordingly, we hold that the expenditures of $10,976.44 for engineering services are nondeductible as a current expense.

*Decisions will be entered under Rule 50.*