Clarence J. Wolf and Mabel Wolf v. Commissioner.
Wolf v. Commissioner
Docket No. 86485.
United States Tax Court
T.C. Memo 1961-269; 1961 Tax Ct. Memo LEXIS 81; 20 T.C.M. (CCH) 1408; T.C.M. (RIA) 61269; September 28, 1961
Louis R. Gilbert, Esq. and Francis E. Hickey, Esq., 206 News Tower, Rockford, Ill., for the petitioners. Joel Yonover, Esq., for the respondent. MULRONEY Memorandum Findings of Fact and Opinion MULRONEY, Judge: The respondent determined a deficiency in the petitioners' income tax for 1957 in the amount of $22,550.26. The sole question before us is the fair market *82 value of certain land and buildings distributed to petitioner by his wholly-owned corporation. Findings of Fact Some of the facts have been stipulated and they are herein included by this reference. Clarence J. and Mabel Wolf, husband and wife, are residents of Belvidere, Illinois. Their joint income tax return for the year 1957 was filed with the district director of internal revenue at Chicago, Illinois. Prior to January 22, 1957 the petitioners owned all the outstanding stock in Belvidere Transfer, Inc. (hereinafter sometimes called the corporation), a trucking concern. The corporation's place of business was located at 118 West Pleasant Street, Belvidere, Illinois, in a building which had previously been used as an interurban terminal. The corporation, in addition to owning trucks and other equipment, held title to the improved real estate at this address (hereinafter called the West Pleasant Street property). The lot had approximately 60 feet of frontage and was 135 feet deep. The brick building was approximately 20 feet wide and 120 feet long. The front part of the building (approximately 20 feet by 30 feet) was used for office space and the back portion of the building *83 was used for storage and for loading and unloading trucks. On January 22, 1957 the petitioners sold all of their stock in the corporation to Fred L. Welles (as nominee for George C. Garrison) for $80,000. The purchasers had indicated prior to this date that they did not wish to purchase the West Pleasant Street property, since it was their intention to conduct operations away from Belvidere. Between January 20, 1957 and January 24, 1957 the corporation, in accordance with an agreement made with petitioners prior to the date of the sale by petitioners of their stock to Welles, transferred the West Pleasant Street property to petitioners. On the books of the corporation the transfer was charged to "Surplus Account". At the close of the year ending December 31, 1956 the corporation had $76,061.84 in its "Surplus Account". About December 3, 1956 the mayor of Belvidere appointed several members of the city council to a committee to investigate different sites for off-street parking. The work of the committee was well publicized. On the same day that the West Pleasant Street property was transferred to the petitioners by the corporation, Clarence contacted his real estate agent and suggested *84 that he offer the property for sale to the city for use as an off-street parking site. Clarence told his real estate agent that he wanted $32,500 for the property. A short time prior to January 28, 1957 members of the committee for off-street parking informed Elizabeth M. Sullivan and her brother, Emmett Sullivan, who were merchants in the city, that the city had an opportunity to buy the West Pleasant Street property but did not have sufficient funds for the purchase at that time. It was decided that the Sullivans would purchase the property and that later the city would make every effort to purchase it from the Sullivans at the same price. On or about January 28, 1957 the petitioners granted an option to purchase the West Pleasant Street property to Elizabeth M. Sullivan. The option, which could be exercised no earlier than August 1, 1957 and no later than September 1, 1957, provided that the total purchase price required to be paid by Elizabeth M. Sullivan to the petitioners would be $32,500. The consideration for the option was $3,250, which amount was paid by Elizabeth M. Sullivan to the petitioners on or about the date the option was executed. The option provided that the *85 $3,250 would be credited to the account of the buyer in the event the option was exercised, and forfeited if the option was not exercised. The minutes of the City of Belvidere dated April 1, 1957 contain a resolution of the city planning commission recommending to the city council the purchase of the West Pleasant Street property. On August 15, 1957 Elizabeth M. Sullivan exercised her rights under the option to purchase the West Pleasant Street property. At the time the property was sold to Elizabeth M. Sullivan, Clarence knew that the property would be resold to the city. On or about November 5, 1957 the City of Belvidere purchased the West Pleasant Street property from the Sullivans [1] for $32,869.71. The building located on the property at 118 West Pleasant Street was torn down in September or October 1957. Petitioners did not report any amount as dividend income in their joint return for 1957 on account of the distribution to them by the corporation of the West Pleasant Street property in January 1957. Respondent determined that the improved *86 real estate had a fair market value of $30,361.90 at the time it was distributed to petitioners and included this amount in their income for 1957 as "dividend income taxable under Section 61 of the Internal Revenue Code of 1954." Opinion It is admitted petitioner received a dividend distribution within the purview of sections 316 and 301 when the corporation transferred the realty to him. Section 301(b)(1) provides the amount of such dividend distribution shall be "the fair market value of the * * * property received." The sole question presented in this case is what was the fair market value of the improved real estate at the time of its distribution (between January 20, 1957 and January 24, 1957) by the corporation to the petitioners, who owned all of its stock. Respondent determined a fair market value of $30,361.90 for the property as of that date, while petitioners contended that the amount should be $10,250.63. [2]
Respondent's determination is presumptively correct and the burden of proof is on petitioners to show error in such determination. *87 We do not believe they have done so. It is established that the fair market value of property is the price at which it would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy and sell and both being informed of the material considerations. Lester E. Dellinger, 32 T.C. 1178. We think that the facts of this case provide a ready application of this test. Since December 3, 1956 the City of Belvidere was making an active search for sites to be used for off-street parking, and the evidence indicates that Clarence, one of the petitioners, know about this because when his corporation distributed the land and building to him in January 1957, he immediately told his real estate agent to offer the property to the city. He also told his real estate agent that he wanted $32,500 for the property. On or about January 28, 1957, only a few days after the property was distributed to the petitioners, they granted an option to Elizabeth M. Sullivan, a merchant of Belvidere, to buy the property for $32,500. Before executing the option, Elizabeth knew that the city was interested in this property but was without sufficient *88 funds at the time. She testified that certain members of the city's off-street parking committee had finally convinced her and her brother that "if we would go ahead and make the arrangements in our name, that they thought that at a later date they would be able to purchase the property - that is, the city would be able to purchase the property at the exact price we paid for it." On April 1, 1957 the city planning commission recommended to the city council the purchase of the property, and the city council subsequently agreed to buy it. The mayor of Belvidere testified as follows: Q. Did the City Council pass upon the purchase price of $32,000-some dollars? A. They did. Q. Did the council consider that a fair purchase price for that property? A. They did. On August 15, 1957 Elizabeth exercised her rights under the option to buy the property for $32,500, and early in November 1957 the city purchased the property from the Sullivans for $32,869.71. We think that these events, beginning almost contemporaneously with the date of the property distribution to the petitioners in January 1957, strongly support the respondent's determination that the fair market value of the property *89 on January 20-24, 1957, was $30,361.90. [3] Certainly the evidence reveals a willing seller and a willing buyer arriving at a price considered fair by both, and with neither under a compulsion to buy and sell. The witnesses for the petitioners testified that their approval of the fair market value of the land and building on January 24, 1957 was in the neighborhood of $12,500 to $13,000. We have examined their opinion testimony with care and we find it to be singularly unpersuasive. Both appraisals of the land and building were made in December 1958, about a year after the building had been torn down. Yet one of the appraisers (Jack Brereton) testified that the building was still standing in December 1958 when he purportedly inspected the property. The other appraiser (Robert V. Wells) testified that the building was "frame-type", and yet a picture of the building shows it to be brick, and as far as we can tell from the record, this same appraiser was acquainted *90 with this building only through being in it at various times on insurance business with "persons that worked for Mr. Wolf, as individuals." Wells also admitted that he did not know how many square feet there were in the building. Also there is little in the testimony of both appraisers to show the Court to what extent they relied upon the various factors which enter a sound appraisal. Brereton testified in cross-examination that he considered sales in that vicinity but it developed that the sale he had in mind was in 1952, about 5 years before the date which is pertinent to this case. It is unnecessary to indicate the other reasons, apparent in the record, which convince us that little weight, if any, can be given to these appraisals, which were based upon imperfect information and upon a lack of familiarity with the facts. In short, we think that the option to buy the property granted almost concurrently with the distribution of the property to the petitioners supplies a more satisfactory criterion of fair market value than the type of opinion evidence submitted by the petitioners. In John J. Flynn, 35 B.T.A. 1064, we said that "[where] sales of the property to be *91 valued have been made they are preferred as evidence of value rather than opinion." We think this is particularly applicable here. Petitioners make some argument on brief that they offered to sell all of their stock in the corporation to George Garrison and Fred Welles for $100,000 and that they countered with an offer of $80,000 if (1) the petitioners kept the land and building and (2) the corporation canceled an indebtedness of $12,500 which Clarence owed the corporation, and that this somehow shows that the land and building were only worth $7,500. There is no merit in this argument. We need only point out that Garrison testified that "[we] offered him $80,000, and told him we absolutely, under no circumstances would buy the stock if we had to take the terminal." We fail to see how these negotiations for the trucking business cast any light on the value of the land and buildings. As pointed out earlier in this opinion, the test for fair market value envisages a willing buyer and willing seller. It would be difficult to imagine a more unwilling purchaser of the land and building than Garrison. We sustain the respondent on this issue. Decision will be entered for the respondent. *92 Footnotes
1. The warranty deed dated November 5, 1957 indicates that the sellers are Robert Emmett Sullivan and Elizabeth M. Sullivan.↩
2. Petitioner alleges in the petition that the fair market value of the property on January 24, 1957 was $12,000.↩
3. Respondent explains on brief that the "difference between the value determined by the Commissioner, $30,361.90, and the sales price $32,500.00, results from reducing the sales price by the costs involved in the sale."↩