Elmo Meiners and La Verne Meiners v. Commissioner.
Meiners v. Commissioner
Docket No. 6413-69.
United States Tax Court
T.C. Memo 1972-91; 1972 Tax Ct. Memo LEXIS 165; 31 T.C.M. (CCH) 359; T.C.M. (RIA) 72091; April 24, 1972, Filed. Robert E. Johnson, One Indiana Square, Indianapolis, Ind., for the petitioners. Robert G. Martinell, for the respondent. WITHEY
Memorandum Findings of Fact and Opinion WITHEY, Judge: Respondent determined deficiencies in the income tax of petitioners and additions to tax as follows: Addition to tax
Sec. 6651(a),
Year
Deficiency
I.R.C. 1954 [1]
1965
$6,183.19
1966
3,591.31
$425.30
The issues presented for our consideration are: (1) whether petitioners realized income by the transfer of land to petitioner Elmo Meiners from a corporation in which petitioners are shareholders for less than *167 the fair market value of the land; and (2) whether petitioners' 1966 income tax return was filed late due to willful neglect and not due to reasonable cause. Findings of Fact Some of the facts have been stipulated and are so found and incorporated herein by this reference. The petitioners Elmo and LaVerne Meiners are husband and wife and were residents of Anchor, Illinois, on the date their petition was filed. Petitioners filed joint individual income tax returns for 1965 and 1966 with the district director of internal revenue, Spring- efield, Illinois. Elmo Meiners, hereinafter sometimes called petitioner, was president of M & W Gear Company. Since its incorporation in 1950, Meiners owned 125 shares, or 41 2/3 percent of its stock and his wife LaVerne Meiners owned 25 shares, or 8 1/3 percent of M & W's 300 shares of outstanding stock. Since before 1965, M & W has been a successful manufacturer of farm implements and machinery. Its assets in 1965 were approximately $4.7 million. Due to M & W's growth, its offices and manufacturing facilities became inadequate. On September 8, 1964, M & W acquired a tract of land of approximately 80 acres known as the Webb tract. This *168 tract had been used as farmland but M & W intended to use it as the site of a new factory and office building. The Webb tract is rectangular in shape and is longer from north to south than from east to west. This tract when acquired by M & W was flat land with its northwest corner lying at the southeastern intersection of Illinois State Highway Route 47 and the two highways United States Highway 54 and Illinois State Highway Route 9 running east and west. Illinois Route 47 runs along the west side of the Webb land. Illinois Route 9 and United States Highway 54 run along the north side of the Webb land. As Illinois Route 9 leaves the Webb land, it continues straight east into Indiana and United States Highway 54 on the northeast corner of the Webb land starts turning north so that the intersection of Routes 9 and 54 are about 200 feet east of the northeast corner of the Webb land. The intersection is about one-half mile south of the business section of Gibson City, Illinois. A number of commercial enterprises were located at the intersection in 1964. These included two major brand gasoline stations, a Chrysler dealership, a bowling alley, a farm implement dealer, a restaurant (Country *169 Charm), and a bottled gas business. To the west of the tract was a residential subdivision. Illinois Route 47 runs in a northerly direction along the western boundary of the tract. At the intersection, Route 47 turns west. Illinois Route 47 runs northeast from Decatur, Illinois, through Champaign-Urbana, Illinois, where it turns north, passes close to Gibson City and continues to the northern boundary of Illinois, passing 45 miles to the west of downtown Chicago. Route 54 runs north-northeast connecting Springfield, the capital of Illinois, with downtown Chicago. Illinois Route 9 runs along the northern boundary of the Webb tract and continues in an east-west direction through the intersection. This route also runs east-west across the entire State passing just south of Peoria, Illinois. When M & W purchased the Webb land, the land lying directly across from it on the west side of Illinois Route 47 had been 361 developed with streets, lots sold, gas lines, and gas meters installed in 1951, subdivided and platted as Cenders Subdivision by Emery P. Cender and his partner, Alva Cender. Cenders Subdivision lies west of Illinois Route 47 and approximately 221 feet south of *170 Illinois Route 9 and United States Route 54, facing on Illinois Route 47, and consists of 47 acres of land. In 1951, the Cenders had negotiated for the purchase of this 47-acre tract which was then all farmland lying approximately onehalf mile sounth of the business section of Gibson City, and paid approximately $550 per acre therefor. M & W Gear Company intended to build a plant and office on the Webb land south of Route 9 which runs easterly and westerly and faces Route 47 which runs northerly and southerly. Initially space was provided in the plans for a cafeteria in the M & W Gear Company building for the convenience of the Company's employees. Meiners as president of M & W was in the process of ordering cafeteria equipment when he talked to the president of Ludell, another manufacturing company, who offered to sell M & W its cafeteria equipment at 50 cents on the dollar. Lundell's company, like M & W, felt it was advisable to have a cafeteria at their plant but found only about 25 percent of their employees ate at the cafeteria and the others went out to eat, making the cafeteria operation impractical to Lundell's company. M & W then decided the cafeteria at the Company's *171 office and plant might also turn out to be undesirable if it was in the Company's building operated by M & W employees. M & W decided to turn the previously planned cafeteria space into another use and try to interest a food handler in opening a restaurant near the plant where the employees could conveniently go and feel they were getting away from their work. Also all of the Webb land was not needed for the manufacturing plant so M & W sold unneeded parts of the tract to commercial and industrial users. Among these sales was the sale on July 6, 1965, of approximately 4.6 acres of land located in the northeast corner of the Webb tract to Electronic Components Corporation, hereinafter called Electronics, for approximately $7,500. This land lies east of Route 47 and faces on Route 9. The northwest corner of the Webb tract, a tract of about 1.06 acres, was sold for $35,000 to Quality Oil Company as a site for the construction of a Gulf Oil gas station. This site faces the interestion of Illinois Route 9, United States Route 54, and Illinois Route 47, and had access to 285 feet along Illinois Route 9 and United States Highway 54 and to 215 feet along Route 47. In the fall of 1965, *172 after a fire in the restaurant of Elmer V. Jacobs and his wife in Gibson City, Meiners talked with the Jacobs. Since M & W had decided not to build a cafeteria in their factory, it was interested in having a restaurant nearby for their personnel. At first the Jacobs refused to operate a restaurant near M & W but finally, after Meiners sketched out plans for a restaurant and cocktail lounge, the Jacobs agreed to run the restaurant and lounge if it were built. Initially, M & W and the Jacobs were each to take half the stock in a new corporation that would build the restaurant and lounge which the Jacobs would operate. However, the general manager and accountant for M & W was concerned about the Company's possible liabilities in owning a part interest in a restaurant and lounge with a license for alcoholic beverages where its employees were likely to be customers. The general manager suggested that Meiners individually might own stock in such a new corporation but that M & W should not. On October 13, 1965, Jake and Kate's, Inc., was incorporated in the State of Delaware with 300 shares of stock authorized and a stated capital of $3,000. On October 19, 1965, Jake and Kate's, Inc., filed *173 an application for a certificate of authority of a foreign corporation to transact business in the State of Illinois and own and mortgage a restaurant, lunch room, and tavern on Illinois Route 47. Such a certificate was issued on October 26, 1965. On October 29, 1965, M & W transferred 1.145 acres of land from the Webb tract to Meiners. This tract was 215 feet south of the centerline of Illinois Route 9 and United States Highway 54 and facing on Route 47 and is continguous with the south boundary of the Quality Oil Company tract. This tract was close enough to the east-west highway that advertising signs could be visible from both highways forming the intersection. Meiners paid M & W $1,500 for the 1.145 acres which had access along Illinois Route 47 of 175 feet and a depth of 285 feet with no road on the north, south, or east side of such land. This sale was approved by the directors of M & W 362 Gear Company who, at the suggestion of its general manager and accountant, set the value at $1,500, or $1,310.04 per acre, so that the Company would recover its cost in the property and make something on its investment. On October 30, 1965, Meiners conveyed the land received from *174 M & W to Jake and Kate's, Inc., in return for 150 shares of the latter's common, no par value stock. The other 150 shares of common, no par value of the total issued stock of Jake and Kate's, Inc., were acquired by the Jacobs who contributed $1,500 in cash. Thus, the total initial capital stock of the corporation issued was 300 shares of common, no par value capital stock. There were three directors of Jake and Kate's, Inc., namely, Elmer V. Jacobs, his wife Catherine, and Meiners. Jacobs was elected president, his wife secretary and treasurer, and Meiners vice president of the corporation. On November 13, 1965, Jake and Kat's, Inc., borrowed $85,000 in order to build a restaurant and lounge on the above portion of the Webb land deeded to the corporation which the corporation had rented to the Jacobs, who thereon operated the Jake and Kate's restaurant. In the fall of 1965, the community wanted to build a church on part of the Webb land. Meiners, on behalf of M & W, agreed to sell the Gibson City Church of Christ 1.3 acres of land lying south of Illinois Route 9 and United States Highway 54 facing on Illinois 47 (south of the building that M & W built) for $1,250 or $961.54 per *175 acre. The church asked Meiners to attend their dedication and on that day, September 3, 1965, Meiners, on behalf of M & W, presented them with the deed as a charitable donation from M & W. On its Federal income tax return for 1965, M & W took a charitable deduction in the amount of $1,250. For 1966 and prior years, the individual income tax returns of the petitioners were normally prepared by Wayne Powell, the general manager and accountant for M & W. Meiners' secretary kept daily, weekly, and monthly records of Meiners' income and expenses. These records and information were turned over to Powell and if he had questions he would occasionally talk to Meiners about the returns. For the calendar year 1966, Powell advised petitioner that he did not have all the information necessary to complete the 1966 return on time and he would ask for a 90-day extension of time to file petitioners' 1966 return. No extension of time was attached to the original 1966 return which was filed late on July 17, 1967. Ultimate Findings of Fact The fair market value of the land transferred to petitioner on October 29, 1965, by M & W Gear Company was $10,000 at the date of transfer, and he received *176 a dividend of $8,500 includable in his gross income as a result of such transfer. The failure of petitioners to file their 1966 income tax return timely was due to willful neglect and not due to reasonable cause. Opinion Respondent determined that during the taxable year 1965 land was transferred to petitioner by the M & W Gear Company for less than its fair market value resulting in a dividend in the amount of $13,500 includable in his gross income under section 61 of the 1954 Code. [2] Essentially, it is respondent's position that Meiners received this dividend from M & W upon the transfer of a parcel of undeveloped land of about 1.145 acres to him for $1,500 on October 29, 1965, which Meiners transferred the next day to a newly formed corporation, Jake and Kate's, Inc., in exchange for one-half of the corporation's stock, and the other half of the corporation's stock was issued to Elmer V. Jacobs in consideration of $1,500 in cash contributed to the new corporation. Respondent's determination of fair market value is presumptively correct and the burden of proving error is on petitioners. Lester E. Dellinger, 32 T.C. 1178, 1185-86 (1959). *177 It is well settled that a shareholder realizes income through the purchase of a corporation property for less than its fair market value to the extent the corporation has earnings and profits. Jason L. Honigman, 55 T.C. 1067 (1971); sec. 1.301-1(j), Income Tax Regs.[3] Under 363 sections 61(a) and 301(c)(1), gross income includes dividends. Dividends are distributions of property from a corporation to a shareholder out of earnings and profits, sec. 316(a). Property includes cash or any other property, sec. 317(a). Under section 301 (b)(1)(A), the amount of the distribution is the amount of cash plus the fair market value of other property received. Fair market value is determined at the date of distribution, sec. 301(b)(3). Petitioners have not questioned the adequacy of M & W's earnings and profits. *178 Further, it is immaterial whether the transferor-corporation intended the transfer to be a dividend; it is the effect of the transfer that is determinative. Lester E. Dellinger, supra. Also, it is immaterial whether the transfer was made pro rata to all shareholders. Paramount-Richards Th. v. Commissioner, 153 F. 2d 602, 604 (C.A. 5, 1946), affirming a Memorandum Opinion of this Court. The parties agree that a "bargain sale" to a stockholder by a corporation could result in a dividend to the stockholder to the extent that the fair market value of the property transferred exceeds the consideration paid therefor. Since the parties have stipulated that Meiners paid M & W $1,500 for the 1.145 acres in controversy, the pivotal issue is what was the fair market value of the land transferred to Meiners on October 29, 1965. Petitioner contends that the fair market value of the 1.145 acres in issue was not more than $1,500. It is well established that fair market value is the price at which property would change hands in a transaction between a willing buyer and a willing seller, neither being under compulsion to buy or sell and both being informed of the material *179 considerations. In the instant case, our ultimate finding of a fair market value of $10,000 for the undeveloped land herein involved on the date of the transfer of this property to petitioner represents our conclusion based upon a consideration of the relevant testimony, exhibits, and stipulated facts in the entire record. Although we have, to a large extent, relied upon the testimony of John F. Gwinn for the reasons hereinafter set forth, we are unable to accept the precise value determined by him. We have also given careful consideration to the views expressed by Tracy Shields and Emery P. Cender. Respondent's witness Gwinn considered many relevant factors including the commercially useful features of the tract in question and comparable sales of other commercial tracts. He considered the sale of the northwest corner of the Webb tract from M & W to Quality Oil on October 7, 1965, for $35,000 to be the most reliable comparable sale. The site purchased by Quality Oil is slightly smaller than the tract in dispute and the two tracts had similar commercial potential. The tract in dispute is contiguous with the southern boundary of the Quality Oil tract and fronts on the north-south *180 highway forming the intersection of State Highways 9 and 47. No evidence was presented that Quality Oil was not an informed purchaser. A Gulf Oil service station was later erected on the site. Gwinn believed that the tract in dispute was less desirable than the Quality Oil tract since the tract in dispute actually fronted on only one highway. Gwinn considered several comparable transactions to compare the relative value of corner commercial lots to the contiguous lots fronting on only one street or highway. Each of the three properties selected as comparable was located in an area more densely populated than the Gibson City area, and the prices of both corner lots and contiguous lots were higher. Applying these comparables to the tract in controversy and the commercial potential thereof, among other factors, Gwinn determined the restaurant tract to be worth about 40 percent of the QUALITY Oil tract, or $15,000 as of the applicable valuation date. Petitioner's witness, Emery P. Cender, arrived at a fair market value of $2,500 for the restaurant tract in question. In the main he reached this conclusion by making use of a sale of approximately three-quarters of an acre on Route 47 opposite *181 the land in question which he personally sold in March 1954 for $2,500 and which was used for the construction of the Country Charm restaurant. Notably, the per-acre price of that tract was $3,400, substantially above the value he assigned to the restaurant tract involved herein. Yet that sale occurred in 1954, long before M & W Gear 364 moved its headquarters and manufacturing plant to the Webb land. We cannot rely upon Cender's assumption that land values in the vicinity of the Webb tract had remained almost static for 10 years, there being no suggestion in the record to support such a view. Likewise we find the opinion offered by petitioner's other witness Tracy Shields of virtually no value. Shields concluded that the value of the land in dispute was $2,519, apparently basing his opinion on a ratio of the per-acre price of farmland in the area. However, it is clear that the 1.145-acre tract in dispute, surrounded by several business operations including a large manufacturing plant, is commercial property and its value is not determinable by the price of farmland. Also Shields considered the cost of building a new restaurant facility on the tract in question and how profitable *182 the operation thereof would be as a material factor in the valuation of the tract. We do not deem this factor as having any significant bearing on the value of the site involved on the date of its transfer to petitioner. Under the circumstances we cannot give too much weight to the testimony of petitioner's witnesses. In our approach to the issue of valuation, we believe that the existing environment has a significant bearing on valuation and here the existence of the Gulf Oil station contiguous to the tract in question substantially enhanced the value thereof for retail business. Three major highways afford excellent access to the property under review and provide a steady flow of local and interstate traffic. Obviously, the service station would tend to stop the flow of traffic and create a ready source of business. The traffic flow provides an excellent advertising media since the restaurant tract is located on the north-south highway and close enough to the east-west highway for signs to be visible from both roads. Also, the tract is only a short distance from the center of Gibson City and the interesection was established as a commercial area at least by the time M & W's manufacturing *183 plant was erected. Petitioner's witnesses direct our attention to the sale of 4.6 acres of raw land in the northeast corner of the Webb tract by M & W to Electronic Components Corporation in July 1965 for about $7,500 which amounts to about $1,630 per acre. In our judgment this sale is an inadequate comparable to the land in question since the acreage purchased by Electronic Components is approximately one-fourth of a mile east of the intersection of Routes 9 and 47 and the other commercial properties in the vicinity thereof. Moreover, the size and odd shape of the tract bought by Electronic Components make it less desirable in several material respects than the restaurant tract in question. Similarly we have considered the conveyance on September 3, 1965, of 1.3 acres of land south of the intersection of Routes 9 and 47 by M & W to the Gibson City Church of Christ. Petitioner suggests that the amount for which M & W originally agreed to sell this tract, i.e., $1,250, to the the church represents its fair market value. In our view, M & W never intended to sell this tract to the church for its fair market value, but was motivated to contribute the land gratis by a desire to foster *184 good public relations and to serve the community. We have carefully considered all of the testimony of petitioner himself and the expert witnesses. We do not believe that the evidence Meiners presented to establish the fair market value of the restaurant tract in question is sufficient to negate the $35,000 price M & W received for the Quality Oil tract during the same year. Considering the amount M & W received for the corner tract, petitioner's valuation of the adjacent tract is without logical foundation. He stated that the price paid for the restaurant tract was determined by adding a few hundred dollars to the average per-acre price of the 80-acre Webb tract to give M & W a profit for holding the land since September 1964. In our opinion, the average per-acre price of the Webb tract, virtually all of which is farmland, is of no aid in determining the fair market value of the restaurant tract involved herein which is a small site, ideal for commercial use. On the basis of our analysis of the entire record, we do not believe that M & W intended to sell this tract to Meiners for its fair market value. The sale to petitioner and the subsequent conveyance to the newly formed corporation, *185 Jake and Kate's, Inc., was not an arm's length transaction. The Company intended to recover from the transfer of this land only its average peracre cost in acquiring the entire Webb tract, plus a few hundred dollars profit for the time it had held the land. Viewing the record in its entirety, we believe that the 365 real consideration for the transfer was that the Jacobs agreed to operate the restaurant and petitioner was anxious to have a restaurant available for M & W's employees. Petitioner testified in this connection that he told the Jacobs that if they agreed to operate a restaurant if it were built, they would own half of the corporation and "eventually own the whole thing, as time goes on." From our analysis of the entire record, we have reached the conclusion that the fair market value of the tract in controversy was $10,000 as of the applicable valuation date. The second issue related to the addition to tax under section 6651(a) of the 1954 Code for delinquency in filing petitioners' 1966 return. Petitioners delegated authority to an accountant to execute and file their return for that year and the return was filed on July 17, 1967. The petitioners contend that their *186 return was filed three months late because of the complexity of the return and they relied on their accountant's statement to Meiners that he was going to file for a 90-day extension of time. No extension of time was attached to the 1966 return. It is well settled that a taxpayer cannot shield himself from liability for failing to file his return timely on the ground that he delegated the task to his accountant. Eagle Piece Dye Works, 10 B.T.A. 1360, 1368 (1928). Accordingly respondent is sustained on this issue. Decision will be entered under Rule 50. Footnotes
1. Unless otherwise indicated, all section references are to the Internal Revenue Code of 1954, as amended.↩
2. SEC. 61. GROSS INCOME DEFINED. (a) General Definition. - Except as otherwise provided in this subtitle, gross income means all income from whatever source derived, including (but not limited to) the following items: * * * (7) Dividends:↩
3. In dealing with so-called "transfers for less than fair market value," sec. 1.301-1(j), Income Tax Regs., provides in part as follows: If property is transferred by a corporation to a shareholder which is not a corporation for an amount less than its fair market value in a sale or exchange, such shareholder shall be treated as having received a distribution to which section 301 applies. In such case, the amount of the distribution shall be the difference between the amount paid for the property and its fair market value. * * *↩